OPINION OF THE COURT
Harold J. Rothwax, J.
These defendants are the remainder of a group of 14 who were jointly indicted for enterprise corruption (Penal Law § 460.20 [1] [a]) and related crimes. Five of the original defendants, including a corporate defendant, pleaded guilty, and one of them, Robert Perrino, is a fugitive.
The indictment describes the criminal enterprise as the "Post Circulation Crew” (hereinafter identified as the Crew), which allegedly existed for the purpose of controlling the circulation department of the New York Post by means of extortion, coercion, the falsification of business records, larceny, bribery and other crimes for financial gain. The evidence before the Grand Jury established that the Bonnano crime organization employed the structure of the Post’s delivery department to conduct a variety of unlawful schemes. The Crew included the superintendent of delivery of the Post, Robert Perrino, who is also an associate of the Bonnano crime organization. An eavesdropping device, installed inside Perrino’s office at the Post, intercepted conversations which revealed the hierarchy within the criminal enterprise. Tapes show that Perrino received instructions from Salvatore Vitale, an unindicted coconspirator and the acting boss of the Bonnano crime organization. Perrino remitted portions of the proceeds of the Crew’s illicit activities to Vitale. Perrino conducted various criminal schemes on the premises of the Post, using his position as superintendent of delivery to fur *12 ther these criminal schemes. Among the schemes was usury, which Perrino conducted in part by his control over checks issued to men who worked under him and who were the victims of his usury. The evidence also showed that the defendant John Vispisiano, the business agent at the Post for the News and Mail Deliverer’s Union (NMDU), in concert with Perrino, accepted payment to influence his discretion in regard to the enforcement of union rules covering Post drivers. Additionally, Vispisiano and Perrino engaged in a larcenous scheme to cause the Post to repurchase as unsold newsstand newspapers (known in the industry as "returns”), papers distributed free as samples for home delivery. Perrino oversaw this and another larcenous returns scheme operated by Perrino with one Joe Torre through the corporate defendant, Citiwide News. Perrino used Post drivers to carry out these larcenous schemes by funneling nonredeemable papers back to the Post as legitimate "returns”. Salvatore Vitale shared in the proceeds of these larcenies. Perrino also created and operated a payroll scam which involved placement on the Post payroll of a nonexistent person using the Social Security number of a deceased member of the Bonnano organization. In addition, Bonnano member Richard Cantarella was paid on the Post payroll for work he did not perform.
The indictment also alleges an agreement to commit a scheme to defraud Post advertisers by inflating Post circulation figures and thereby influencing the rate which advertisers paid for circulation. Members of the circulation department, including the defendant Michele created fictitious delivery routes to support inflated circulation figures. Drivers were assigned at random to these nonexistent routes, and supporting documentation including bank accounts were created in these drivers’ names without their knowledge. However two of these drivers, the defendants Turzio and Torre, were chosen by the conspirators, at the direction of their superiors in the circulation department, to misrepresent to circulation auditors that these delivery routes existed. The defendant DiSario, also a Post driver, delivered 2,000 papers nightly to Citiwide drivers, who in turn delivered to vendors, substituting the 2,000 papers for earlier editions of the Post in an attempt to make it appear to auditors that papers were in fact being distributed to the vendors.
The indictment charges each of these defendants with committing enterprise corruption by engaging in certain criminal acts to further a criminal enterprise, which criminal acts are *13 also separately charged in substantive counts as to that defendant. A person is guilty of enterprise corruption under Penal Law § 460.20 (1) (a) when: (1) having knowledge of the existence of a criminal enterprise and the nature of its activities; (2) and being employed by or associated with such enterprise; (3) he intentionally conducts or participates in the affairs of an enterprise (either criminal or legitimate); (4) by participating in a pattern of criminal activity.
The defendants first argue that the statute is vague and the prosecution unconstitutional under the Due Process Clause of the Fourteenth Amendment (US Const 14th Amend). In enacting the enterprise corruption statute, the Legislature sought to define the scope of enterprise corruption more rigorously than comparable Federal statutes. (Penal Law § 460.00, 4th para; People v Capaldo, 151 Misc 2d 114 [Sup Ct, NY County 1991]; People v Moscatiello, 149 Misc 2d 752, 754-755 [Sup Ct, NY County 1990]; cf, H.J. Inc. v Northwestern Bell Tel. Co., 492 US 229, 239 [1989].) The court rejects the defendants’ argument in light of the definition sections of the statute, which render this statute significantly more definite in its scope than the comparable Federal RICO statute (18 USC § 1961 et seq.) which has been upheld as constitutional (see, People v Wakefield Fin. Corp., 155 Misc 2d 775, 783-784 [Sup Ct, NY County 1992]).
The defendants next argue that the statute requires proof that each of them participated in three separate criminal transactions, or in other words in three separate criminal conspiracies (see, e.g., People v Ruiz, 130 Misc 2d 191, 195-196 [Sup Ct, NY County 1985]). This argument is based upon the statutory requirement that each defendant "intentionally * * * participate[ ] in the affairs of an enterprise by participating in a pattern of criminal activity” (Penal Law § 460.20 [1] [a]) and upon the statutory definition of a pattern of criminal activity as "conduct engaged in by persons charged in an enterprise corruption count constituting three or more criminal acts that”, inter alia, "are neither isolated incidents, nor so closely related and connected in point of time or circumstance of commission as to constitute a criminal offense or criminal transaction, as those terms are defined in section 40.10 of the criminal procedure law”. (Penal Law § 460.10 [4] [b].)
The court finds that the defendants’ proposed interpretation of the statute is too narrow and is not supported by the wording of the statute or by legislative history. The defen *14 dants’ proposed interpretation reads the various statutory provisions out of context and without relation to their legislative purpose. The language of Penal Law § 460.10 (4) (b), relied upon by the defendants, describes a necessary attribute of the pattern of criminal activity, and indirectly, of the criminal enterprise, but does not define an element of individual culpability.
In order to establish enterprise corruption, the prosecution must first establish the existence of a criminal enterprise. Penal Law § 460.10 (3) defines criminal enterprise as a group of persons sharing a common purpose of engaging in criminal conduct, associated in an ascertainable structure distinct from a pattern of criminal activity, and with a continuity of existence, structure and criminal purpose beyond the scope of individual criminal incidents. By this definition, a pattern of criminal activity does not necessarily establish a criminal enterprise (see, People v Moscatiello, supra, 149 Misc 2d, at 756). The enterprise refers to the "group of persons” whose "common purpose” is to engage in criminal conduct. The pattern of criminal activity defined in Penal Law § 460.10 (4) is the "conduct engaged in by persons charged in an enterprise corruption count”. In other words, the pattern is the criminal conduct engaged in by the group, not by the individual defendant.
Under the enterprise corruption statute, the criminal enterprise must be proven to exist apart from the pattern of its criminal activity. That is, the enterprise must have (1) an ascertainable structure distinct from an association entered into for the purpose of carrying out the pattern of criminal activity, and (2) a continuity of existence, structure and criminal purpose "beyond the scope of individual criminal incidents”. (Penal Law § 460.10 [3].) The quoted phrase apparently refers to the statutory definition of a criminal incident contained in CPL 40.10 (2) (a), which consists of criminal acts "closely related and connected in point of time and circumstance of commission”. Thus the enterprise must continue in existence beyond the time required to commit any individual criminal incident, and must be distinct from any ad hoc association entered into for the purpose of carrying out one or more of the criminal incidents relied upon to establish its existence. It is notable that the Legislature did not define criminal enterprise as having a continuity of existence and criminal purpose beyond the scope of the pattern of criminal activity. Thus the structure of the enterprise must be greater *15 than the sum of the roles played by its members in the pattern of criminal activity, but the scope of the enterprise may be defined by the pattern of its criminal activity. The legislative findings under article 460 note that "[i]n part because of its diverse nature, it is impossible to precisely define what organized crime is. This article, however, does attempt to define and criminalize what organized crime does.” (Penal Law § 460.00, 5th para.) The same evidence may prove the existence of the criminal enterprise and the scope of its criminal activity. However, by imposing the additional burden of proving that the structure of the enterprise is distinct from the pattern of criminal activity, the Legislature limited the scope of the statute to organizations whose purpose is the commission of crime as a business. (See, Penal Law § 460.00, 4th para.)
The significance of the language of Penal Law § 460.10 (4) (b), relied upon by the defendants, becomes clearer when one recalls that the Legislature was concerned not only with defining organized crime by what it does, but also with limiting the scope of the statute to the threat of organized criminal activity. The legislative definition of a "pattern of criminal activity”[1] adopted and strengthened distinctions noted by the Supreme Court in Sedima, S.P.R.L. v Imrex Co. (473 US 479, 496, n 14 [1985]; see, People v Capaldo, supra, 151 Misc 2d, at 116-117). Section 460.10 (4) was intended to establish that three criminal acts constitute a pattern only where they evince the elements of continuity and relatedness identified by the Supreme Court. The rigorous definition contained in Penal Law § 460.10 (4) means that a repetition of criminal activity by the same group of persons does not necessarily establish a pattern.
*16 In order to amount to a pattern, the acts first must be sufficiently close in time (within 10 years) (Penal Law § 460.10 [4] [a]). Secondly, the acts must evince continuous and not sporadic criminality. They must neither be "isolated incidents” nor so closely related in time and circumstances of commission to constitute a single offense or criminal transaction, "as those terms are defined in section 40.10 of the criminal procedure law”. In other words, the three criminal acts relied upon may neither be part of a single criminal incident nor "so closely related in criminal purpose or objective as to constitute elements or integral parts of a single criminal venture” (CPL 40.10 [2] [b]). The legislative judgment reflected in this definition is that a single criminal transaction, however protracted (see, e.g., People v Helmsley, 170 AD2d 209, 210 [1st Dept 1991]; Matter of Sharpton v Turner, 170 AD2d 43 [3d Dept 1991]), is finite in scope so as to lack the degree of continuity of criminal conduct necessary to justify the enhanced penalties imposed by the statute (see, e.g., Beauford v Helmsley, 843 F2d 103, 110 [2d Cir 1988]). Thirdly, the three criminal acts must be demonstrably related to the criminal enterprise. The criminal acts may relate to the enterprise in one of two ways: either as part of a single conspiracy (Penal Law § 460.10 [4] [c] [i]) or as parts of separate criminal conspiracies engaged in by persons associated with or in the criminal enterprise (Penal Law § 460.10 [4] [c] [ii]). Thus, criminal acts which relate to the common criminal enterprise as spokes to a hub are part of the pattern whether or not they are also connected by the encircling rim of a common criminal scheme (see, Kotteakos v United States, 328 US 750, 755 [1946]). By including crimes that are unrelated except insofar as they are committed by persons associated with the criminal enterprise, with intent to participate in or advance the affairs of the enterprise, the prosecution may include multiple criminal transactions undertaken by the same criminal organization, which otherwise would not be subject to prosecution as a single conspiracy (see also, United States v Minicone, 960 F2d 1099, 1106 [2d Cir 1992]).
The continuity component of the pattern requirement requires proof that the members of the enterprise as a group engaged in at least three separate criminal transactions. The relatedness component requires that the three transactions all have been committed by associates of the enterprise or their accomplices (Penal Law § 460.10 [4] [c] [ii]). However, the relatedness component also brings within the pattern all *17 criminal acts included within these separate criminal schemes (Penal Law § 460.10 [4] [c] [i]). Therefore, the pattern may include crimes that are related through a common scheme or plan, as long as the continuity element is established by proof of at least two other unrelated criminal transactions within the pattern (Penal Law § 460.10 [4] [b]). Consequently, the apparent inconsistency between subdivisions (4) (b) and (4) (c) of section 460.10 of the Penal Law (People v Giordano, NYLJ, Dec. 7, 1992, at 28, col 5 [Sup Ct, NY County 1992]; People v Gambino, NYLJ, May 1, 1991, at 23, col 3 [Sup Ct, NY County 1991]) disappears when the legislative purpose behind each of the subdivisions is considered. It is apparent that those criminal acts which relate to the enterprise under Penal Law § 460.10 (4) (c) (i) may not be separately counted in establishing the minimum number of criminal transactions required to establish continuity under Penal Law § 460.10 (4) (b).
Once the reason that three separate transactions must be proven to establish the pattern requirement is understood, it is apparent that the prosecution need not prove that every defendant participated in all three separate criminal transactions. Penal Law § 460.20 (2) requires proof that each defendant (1) having knowledge of the existence of the criminal enterprise; (2) while employed by or associated with the enterprise; (3) intentionally conduct or participate in the affairs of the enterprise by participating in a pattern of criminal activity. Unlike the Federal RICO statute, the enterprise corruption statute defines participation in a pattern of criminal activity.
A person participates in a pattern of criminal activity when, with intent to participate in or advance the affairs of the criminal enterprise with which he is associated, he "engages in conduct constituting or is criminally liable [as an accomplice] for * * * at least three of the criminal acts included in the pattern”, two of which are felonies other than conspiracy (Penal Law § 460.20 [2]). It is notable that the statute does not require proof that the defendant engaged in conduct constituting a pattern of criminal activity, but only in three criminal acts "included in the pattern”. As previously discussed, acts which are part of a common criminal scheme or plan are included within the pattern of criminal activity where there are other unrelated acts sufficient to establish the required continuity of criminality. Therefore, it is possible for the defendant to participate in the criminal enterprise, with knowledge of its existence and of the nature of its activities, *18 by participating in three criminal acts which are part of the pattern of criminal activity but which are nonetheless related to one another through a common scheme or plan (Penal Law § 460.10 [4] [c] [i]). It follows that a defendant associated with the enterprise, acting with the necessary knowledge and intent, who engages in three criminal acts which are part of a single criminal transaction may nonetheless be guilty of enterprise corruption where the transaction is itself part of the pattern of criminal activity.
This interpretation is also supported by the legislative history. In his transmittal letter, designed "to clarify legislative intent” with regard to the enterprise corruption legislation (L 1986, ch 516), then Assemblyman Miller who was one of the authors of the statute, noted that under the contemporary amendment to the joinder statute (CPL 200.40 [1] [d]), "the criminal conduct joined will, in almost all cases, be the kind of conduct which would have been joinable under current law requirements of a common scheme or plan” (Letter of Assemblyman Miller, July 16, 1986, at 3). One purpose of the legislation noted by the Governor in his memorandum of approval was to enhance penalties for criminal acts which represent an organized "division of labor, specialization [and] diversification” (Governor’s Mem approving L 1986, ch 516, 1986 McKinney’s Session Laws of NY, at 3176). Clearly, specialization and division of labor suggest that individual defendants who engage in one aspect of the criminal enterprise are to be held responsible for the conduct of the larger enterprise where they commit criminal acts with intent to advance the known criminal purposes of the enterprise. To construe the statute so as to require proof that each defendant engaged in multiple criminal transactions would undermine this legislative purpose. The legislative findings state that "these definitions should be given their plain meaning, and should not be construed either liberally or strictly, but in the context of the legislative purposes set forth in these findings” (Penal Law § 460.00, 7th para).
Therefore, the court holds that where the defendant, knowing of the existence of the criminal enterprise and the nature of its activities and being associated with the enterprise, with intent to participate in or to advance the affairs of the enterprise, commits or is otherwise criminally liable for any three criminal acts included within the pattern, the defendant commits enterprise corruption even though the acts may be part of a single criminal transaction.
*19 SUFFICIENCY OF THE EVIDENCE
The court finds that the evidence before the Grand Jury sufficed to establish the existence of a criminal enterprise within the meaning of Penal Law § 460.10 (3). The Crew was a group of persons sharing a common purpose of engaging in criminal conduct, having an ascertainable structure distinct from the pattern of its criminal activity. The structure consisted of a chain of command and profit sharing. The Bonnano crime organization employed the Post’s circulation department to commit crimes. Although the structure of the criminal enterprise encompassed the structure of the Post’s circulation department, the criminal enterprise was larger, including the hierarchy of the Bonnano organization, and the corporate defendant, Citiwide News, an independent newspaper distributor. The hierarchy of the criminal enterprise was independent of the hierarchy of the legitimate enterprise. For example, although Richard Cantarella wielded considerable influence within the criminal hierarchy, he was on the Post payroll as a laborer, and did not in fact work for the Post. Perrino explained to Cantarella that the defendant John Vispisiano was included in the scheme at the direction of the organization.
The enterprise engaged in a pattern of criminal activity within the meaning of the statute (Penal Law § 460.10 [4]). The pattern of criminal activity included more than three unrelated criminal transactions. Among these where two larceny schemes involving falsified "returns” credit, having separate structures and involving different people: the Citiwide scheme operated by Perrino, Michele and Joe Torre; and the "J&J” scheme operated by Perrino, Vispisiano and Joe Steo. Salvatore Vitale shared in the proceeds of these larcenies. Perrino also created and operated two payroll scams: one of which involved placing a nonexistent person on the Post payroll and collecting the salary paid; and the other placing Bonnano member Richard Cantarella on the Post payroll for work he did not perform. The members of the enterprise thus engaged in numerous criminal acts within the enterprise corruption statute (Penal Law § 460.10 [1]) constituting a number of separate criminal transactions (CPL 40.10) using the payroll of the Post, the means of distribution of Post papers, the NMDU and the independent distribution company, to obtain money unlawfully from the Post. Evidence showed that various members of the criminal enterprise directly profited from the operation of these schemes.
The structure of the Crew was distinct from any ad hoc *20 association entered into for the purpose of carrying out one or even all of the criminal transactions in which the enterprise engaged. The purpose of the criminal enterprise was larger in scope than any one of the particular criminal transactions, and the continuation of the criminal enterprise did not depend for its existence upon the continuation of any particular criminal transaction. This is apparent from conversations between Perrino and Embarrato, about the possibility of Richard Cantarella replacing Perrino as the Bonnano organization’s overseer of the criminal enterprise at the Post. It is apparent also that the Crew did not come into existence for the purpose of committing one or more of these criminal transactions, but continued as a criminal organization independently of the particular criminal schemes.
Having determined that the evidence established the existence of a criminal enterprise within the meaning of the statute, the court must consider whether the evidence further establishes reasonable cause to believe that the individual defendants remaining before the court, committed the offense of enterprise corruption (Penal Law § 460.20). Each defendant is charged with having knowledge of the existence of the criminal enterprise and of the nature of its activities, and while being associated with the enterprise, having committed or having been an accomplice to a number of criminal acts, termed "pattern acts” by the indictment, with intent to participate in or advance the affairs of the criminal enterprise. The statute limits the criminal acts which may be considered participation in a criminal enterprise to those felonies or to conspiracy or attempt to commit those felonies specifically enumerated in section 460.10 (1) (a) and (b). In order to establish a prima facie case, the evidence must establish that the defendant committed or is otherwise liable for at least three such criminal acts. .

Richard Cantarella

Richard Cantarella was intercepted acting as representative of Salvatore Vitale in regard to Vitale’s interest in a scheme whereby a home delivery service which received unredeemable newspapers at discount, would redistribute these papers to Post drivers who in turn would redeem the papers as unsold copies of newspapers routinely delivered by the drivers to news vendors. The drivers received 33 cents for each unsold paper. Evidence seized pursuant to a search warrant revealed that the home delivery service, run by the *21 defendants Vispisiano and Joe Steo, both of whom have pleaded guilty, received half of the money for redeemed papers, and that the drivers kept the other half. Cantarella, representing Vitale, was intercepted complaining that Vitale was not receiving his percentage of the money. Cantarella suggested to Perrino that the operators of the scheme were withholding a portion of the proceeds from the organization. Perrino was intercepted explaining the breakdown of profits from the scheme to Cantarella, including Perrino’s share. When Cantarella demanded to know how Vispisiano "got in” Perrino explained: "We put him in there.” This evidence establishes Richard Cantarella’s knowledge of the criminal enterprise and of the nature of its activities, his employment by the enterprise and his intent to further the affairs of the enterprise by intentionally aiding Perrino and Vispisiano to commit larceny from the Post. These pattern acts properly are alleged to constitute accomplice liability to grand larceny in the fourth degree (Penal Law § 155.30 [1]), one of the criminal acts enumerated in the statute (Penal Law § 460.10 [1] [a]).
In addition to Richard Cantarella’s involvement in this larceny, the prosecution relies as further proof of Cantarella’s participation in the pattern of criminal activity, upon his possession of an unregistered firearm at his home on Staten Island. Possession of the firearm is a felony encompassed within the enterprise corruption statute (Penal Law § 460.10 [1]) in light of Cantarella’s previous criminal convictions (Penal Law § 265.02 [1]). The firearm was discovered during execution of a search warrant for Cantarella’s home. One of the elements of enterprise corruption is that the defendant has engaged in the criminal act alleged as part of the pattern, with intent to participate in or advance the affairs of the criminal enterprise (Penal Law § 460.20 [2]). The enterprise alleged here is the Crew, not the Bonnano crime syndicate. There is no evidence that the defendant’s possession of the firearm at his home furthered or was intended in any manner to further the affairs of the Crew. There is no evidence that guns were used by anyone to further the criminal enterprise defined in the indictment. Accordingly, the court finds that Richard Cantarella’s possession of the firearm at his residence is not properly alleged as a criminal act of participation in the pattern of criminal activity encompassed by the enterprise.
The evidence also establishes that Richard Cantarella engaged in a no-show job scheme whereby he collected a paycheck from the Post for working as a tailman, unloading *22 papers from the delivery truck driven by his brother and codefendant Frank Cantarella, when in fact he did not perform this or any other work for the Post. The Grand Jury was entitled to infer that Perrino, as superintendent of delivery, was aware that Cantarella did not perform the duties of a tailman, and that Perrino permitted Cantarella to collect a paycheck because of Cantarella’s position of authority within the criminal enterprise. From 1988 through 1991, the Post paid Richard Cantarella over $190,000, in weekly checks of less than $1,000, for his nonperformance. The prosecution alleges that this conduct constitutes five pattern acts, four of which are based on the calendar years 1988, 1989, 1990, 1991, and the fifth of which is cumulative of all four years, constituting the criminal acts of grand larceny in the third degree and grand larceny in the second degree (Penal Law §§ 155.35, 155.40 [1]). The defendant argues that his conduct constituted a single continuous larceny, which the prosecution may not arbitrarily subdivide in order to satisfy the statutory requirement of proof of three or more criminal acts committed by the defendant to further the criminal enterprise.
The court notes that the enterprise corruption statute does not include petit larceny within the criminal acts which may be considered as part of a pattern of criminal activity. Generally, multiple larcenies may be considered as a single offense where the property is taken from the same owner by a series of acts which are pursuant to a single intent and in execution of a common fraudulent scheme (see, People v Cox, 286 NY 137, 145 [1941]; cf., People v Thiel, 26 AD2d 897 [4th Dept 1966]). A series of petit larcenies from the same owner, governed by a common fraudulent scheme, extending over a period of time may be charged as a single grand larceny (see, e.g., People v Rosich, 170 AD2d 703 [2d Dept 1991]; cf., e.g., People v Perlstein, 97 AD2d 482, 484 [2d Dept 1983]). The decision whether to charge such conduct in the aggregate is for the prosecution. The prosecution properly chose to aggregate the defendant’s larcenies into grand larceny which is a criminal act within the enterprise corruption statute. However, in the court’s view, considering the severity of the penalties imposed by the enterprise corruption statute and the adequacy of the penalties imposed by the larceny statutes, once the prosecution has elected to aggregate the defendant’s larcenies, it may not arbitrarily exercise this discretion to aggregate only portions of a continuous series of petit larcenies undertaken from a single owner pursuant to a common *23 fraudulent scheme, in order to create multiple counts of grand larceny and thereby to establish the minimum number of required pattern criminal acts. The court therefore finds that this evidence establishes the pattern criminal act of grand larceny in the second degree (Penal Law § 155.40 [1]).
Since the evidence before the Grand Jury establishes only two criminal acts committed by Richard Cantarella having the necessary connection to the criminal enterprise, the count of enterprise corruption is dismissed as to Richard Cantarella.

Vincent DiSario

Vincent DiSario is charged with enterprise corruption based upon allegations that he twice possessed loaded firearms on the premises of the Post, that he committed grand larceny in connection with one of the returns schemes, and that he engaged in a scheme to defraud and falsified business records in connection with the circulation fraud. These allegations are sufficient on their face to establish enterprise corruption by DiSario.
However, in order to prove enterprise corruption, there must be evidence sufficient to establish each element of each pattern criminal act (Penal Law § 460.10 [1]), and the defendant’s commission of each crime (Penal Law § 460.20 [2]). Here the evidence before the Grand Jury fails to support the criminal acts alleged.
With regard to the pattern crimes of criminal possession of a weapon (Penal Law § 265.02 [1]), the People failed to prove the operability of the two weapons. Moreover, there is no evidence that the weapons possession constituted participation in the criminal enterprise alleged in the indictment. Even under the Federal RICO statute, a crime unrelated to the criminal enterprise is not a predicate act simply by virtue of its commission on the premises of the legitimate enterprise.
With regard to the alleged grand larceny, construing the evidence most favorably to the People, the Grand Jury could infer that Vispisiano paid DiSario on one occasion for 2,000 papers which were returned to the Post for cash at 33 cents apiece. However, this evidence fails to prove that DiSario was an accomplice to grand larceny, as opposed to petit larceny. To prove grand larceny, the evidence must establish that DiSario aided in stealing more than $1,000 (Penal Law § 155.30 [1]). Here the evidence only establishes that DiSario aided in the theft from the Post of at most $660 (.33 X 2,000). *24 Petit larceny is not among the criminal acts designated in the enterprise corruption statute (Penal Law § 460.10 [1]).
Similarly, the evidence is insufficient to support the crimes of conspiracy to commit a scheme to defraud, scheme to defraud or falsifying business records on the part of DiSario in regard to the circulation scheme. DiSario was chosen by the conspirators, his superiors in the circulation department, to deliver 2,000 papers nightly to Citiwide drivers, who in turn delivered these papers to vendors, substituting the 2,000 papers for earlier editions of the Post in an attempt to make it appear to auditors that papers were in fact being distributed for sale by the vendors named to the auditors. The evidence before the Grand Jury showed that DiSario returned the substituted papers to the Post where they were destroyed. While these deliveries may have been unusual, there is no evidence that the defendant DiSario was aware of the reason for the deliveries or of the alleged conspiracy to inflate circulation figures.
Therefore, since the evidence fails to establish that three pattern criminal acts were committed by DiSario in furtherance of the affairs of the criminal enterprise, the enterprise corruption count is dismissed as to him.

Anthony Michele

The defendant Michele, as director of circulation at the Post, intentionally aided in the creation of false delivery routes in order to deceive the auditors into verifying daily circulation of 50,000 papers which did not in fact exist. The evidence sufficed to establish the criminal acts of conspiracy to commit a scheme to defraud in the first degree (Penal Law §§ 105.05, 190.65) and falsifying a business record in the first degree (Penal Law § 175.10). However, there is insufficient evidence from which the Grand Jury could infer that Michele committed these crimes for the purpose of participating in the affairs of the criminal enterprise (Penal Law § 460.20 [1] [a]). Michele and other members of the Post circulation department who had no proven connection to the criminal enterprise, agreed to inflate the Post’s circulation figures apparently in an attempt to protect the Post’s advertising revenue following the settlement of a strike against the Daily News. This agreement was made independently of and without the knowledge of Perrino or his "Crew”. Michele created the fictitious delivery routes and assigned five Post drivers at random, three of whom coincidentally were members of the *25 "Crew”. There is no evidence that any of the drivers received anything of value as a result of the use of their names, and in fact, there is evidence to the contrary. Michele called upon Perrino to assist in deceiving circulation auditors after the scheme was in operation. Michele recruited Perrino in his capacity as superintendent of delivery. The Grand Jury could infer that Citiwide and Joe Torre were used as a means of actually distributing the 2,000 papers without detection at the suggestion of Perrino. Although Perrino may have been motivated by the desire somehow to include 2,000 papers distributed daily into the returns larceny, there is no evidence that he was successful in doing so. In any event, there is no evidence that Michele committed the alleged crimes of scheme to defraud and falsifying business records in order to further the criminal enterprise (Penal Law § 460.10 [2]). Rather the evidence only supports the inference that Michele conceived and committed these crimes independently of the criminal enterprise, using some of the members of the criminal enterprise, to further the interests of the Post by fraudulent means unrelated to the purposes of the criminal enterprise.

Anthony Turzio

The Grand Jury was justified in finding that the defendant Turzio committed the pattern criminal act of conspiracy to commit a scheme to defraud in the first degree (Penal Law §§ 105.05, 190.65). However, as previously discussed, the conspiracy was intended to defraud Post advertisers, and there is no evidence that this conspiracy was committed in order to further the affairs of the criminal enterprise (Penal Law § 460.20 [2]).
Nonetheless, the evidence does establish Turzio’s participation in another aspect of the affairs of the criminal enterprise sufficiently to sustain the count of enterprise corruption with regard to him. Turzio is charged with committing, as an accomplice, the pattern crime of conspiracy to commit the crime of grand larceny in the second degree (Penal Law § 105.10 [1]; § 155.40 [1]) based on the theft of more than $50,000 from the Post paid in salary to one Anthony Murro. In addition, Turzio is charged as pattern crimes with 21 acts of forgery in the second degree (Penal Law § 170.10 [1]) based upon his endorsement of paychecks issued to "Murro”. The evidence established that Turzio signed "Anthony Murro” to payroll checks issued in Murro’s name. Other evidence established that Perrino possessed documents placing the name *26 Murro on the Post payroll, using the Social Security number of the deceased Murro. Murro had previously been employed as a driver at the Post. Evidence also established that Perrino possessed a stub from a payroll check issued to Murro on May 25, 1991, a date within the period of time Turzio signed Murro checks. Finally, evidence also showed that the defendant Bilboa deposited one of the Murro checks in his personal account. Therefore, the evidence established a conspiracy to steal the salary paid to "Murro” and Turzio’s participation in the conspiracy. Moreover, the evidence established that Turzio committed forgery in furtherance of that larceny. Although "Murro” was nonexistent, the use of Murro’s Social Security number was a sufficient basis for the inference that Turzio and his coconspirators intended to deceive the Post by representing that the endorsement was Murro’s (see, People v Levitan, 49 NY2d 87, 90-91 [1980]). Finally, the evidence justified the inference that the larceny benefitted various members of the criminal enterprise, including Bilboa and Perrino. The Grand Jury was also justified in inferring that Turzio committed these forgeries with intent to participate in and to advance the affairs of the criminal enterprise. Although these forgeries may be characterized as parts of a single criminal transaction designed to steal from a single source, the court has previously determined that the defendant’s commission of three or more criminal acts as part of a common scheme or plan constitutes participation in the pattern of criminal activity, where the transaction is part of a larger pattern established by evidence of other unrelated criminal transactions.
Accordingly, the count of enterprise corruption is sustained as to Turzio based upon his commission of the 20[2] acts of forgery in the second degree and upon his participation in the conspiracy to commit grand larceny (Penal Law § 460.10 [1] M).

Gerard Bilboa, Corey Ellenthal, Michael Fago

Each of the remaining defendants is charged with enterprise corruption based upon his commission of conspiracy to commit grand larceny pursuant to the Murro payroll scheme, and upon the pattern crimes of forgery, possession of a forged instrument and falsifying business records. Each of these *27 three defendants was a foreman at the Post who endorsed payroll checks issued to Anthony Murro. The alleged conspiracy was to commit larceny of the salary paid to Murro. The acts of forgery and possession of forged instruments relate to checks issued to Murro, endorsed by the defendants. Consequently, the enterprise corruption count is sufficient on its face in regard to each of these defendants, insofar as it alleges that each defendant committed more than three pattern criminal acts while participating in the affairs of the criminal enterprise.
However in light of the evidence presented, the legal instruction to the Grand Jury was misleading in regard to the crime of forgery. These defendants each endorsed in his own name, one or more payroll checks issued to Murro. A witness testified that it was common practice for a day foreman at the Post to cash payroll checks issued to night workers with the Post cashier, since the cashier was not open during the night shift. The witness testified that the company required these foremen to endorse their own names on these checks. The money was then placed in an envelope bearing the employee’s name and left in the safe for the night foreman. A witness who had endorsed and cashed checks issued to Murro testified that he did not know that Murro was fictitious, and that day foremen often did not know the names of night employees. There was evidence that Ellenthal, Fago and Bilboa held supervisory positions, but no evidence that they knew or should have known that Murro was not employed by the Post, or was in fact the deceased Murro. In every instance of alleged forgery as to these defendants, the endorsement was in the defendant’s own name. Ellenthal endorsed two checks, Fago and Bilboa one check each.
Generally, a person cannot commit forgery by signing his own name, since the person is both the actual and ostensible maker of the instrument thus created (see, People v Levitan, 49 NY2d 87, 90, supra). An endorsement is considered both a complete written instrument and part of the main instrument in which it is contained (Penal Law § 170.00 [2]). Forgery requires evidence that the written instrument was falsely altered, completed or made with intent to defraud, deceive or injure another (Penal Law § 170.10). Where considered a false making (Penal Law § 170.00 [4]), an endorsement is only a forgery where it purports to be an authentic creation of its ostensible maker, but is not either because the ostensible maker is fictitious or the defendant has misrepresented that *28 he is the ostensible maker. In this case, the defendants clearly did not misrepresent their identity (see, People v Levitan, supra, at 91), but signed the checks in a representative capacity. Where considered a falsely completed (Penal Law § 170.00 [5]) instrument, an endorsement may be a forgery if the endorser completed it "without the authority of anyone entitled to grant” such authority. "The term 'anyone’, of course, refers to the ostensible drawer or maker or his agent.” (See, People v Levitan, supra, at 91.) The law recognizes agency endorsements, and one who endorses a commercial instrument as an agent does not commit forgery (Gilbert v United States, 370 US 650 [1962]; United States v Faust, 850 F2d 575, 582 [9th Cir 1988]). Since the only evidence before the Grand Jury established that foremen such as these defendants had the authority to cash payroll checks by signing their own names as agents of the payee, instruments bearing such agency endorsements were not "forged”. Therefore, upon the evidence presented to the Grand Jury, the instruments could only have been forgeries if the defendants knew that the payee Murro was nonexistent. The Grand Jury was not instructed as to these legal principles.
Since the enterprise corruption statute requires the grand jurors to find that the defendant "engage[d] in conduct constituting, or, is criminally liable for” (Penal Law § 460.20 [2]) three pattern criminal acts, the prosecution must necessarily instruct the Grand Jury as to the elements constituting the alleged pattern criminal acts with the same degree of precision as would be required to obtain an indictment for those criminal acts (see, People v Calbud, Inc., 49 NY2d 389, 394-397 [1980]). Here the charge as to the forgery counts was so incomplete as to deprive the grand jurors of the information necessary to assess the defendants’ culpability. Therefore, the prosecution may not rely upon the alleged pattern crimes of forgery or of criminal possession of a forged instrument as to those defendants who signed their own names to the Murro checks, in the absence of any other evidence of intent to defraud (cf, People v Briggins, 50 NY2d 302, 307 [1980]). Therefore, the count of enterprise corruption is dismissed as to Ellenthal and Fago.
The evidence of forgery was sufficient as to the defendant Bilboa, however, despite his use of his own name to endorse the Murro check, since the Grand Jury could infer from Bilboa’s act of depositing Murro’s paycheck into his own account, that Bilboa knew Murro did not exist and therefore, *29 also knew that he did not have authority to endorse the check as foreman (see, People v McLaughlin, 174 AD2d 418, 420 [1st Dept 1991]; United States v Brown, 236 F2d 403 [2d Cir 1956]). This evidence also suffices to establish the pattern crime of conspiracy to commit grand larceny in regard to the Murro salary. Nonetheless, the evidence of enterprise corruption is insufficient as to Bilboa. The forgery and possession of a forged instrument alleged against Bilboa relate to a single check. The alleged forgery and possession of the forged check are therefore a single criminal act (see, e.g., People ex rel. Fitzgerald v Maher, 61 Misc 2d 22 [Sup Ct, Nassau County 1969] [interpreting the phrase "single act or omission” in Penal Law § 70.25 (2)]; People v Rolling, 176 AD2d 973, 974 [2d Dept 1991]). The evidence therefore fails to establish that Bilboa committed three criminal acts included within the pattern of criminal activity. (Penal Law § 460.20 [2].)
For the foregoing reasons, the enterprise corruption count is dismissed as to all of the remaining defendants with the exception of Anthony Turzio.
[Portions of opinion omitted for purposes of publication.]

. The definition of pattern of criminal activity (Penal Law § 460.10 [4]) reads as follows:
"4. 'Pattern of criminal activity’ means conduct engaged in by persons charged in an enterprise corruption count constituting three or more criminal acts that:
"(a) were committed within ten years of the commencement of the criminal action;
"(b) are neither isolated incidents, nor so closely related and connected in point of time or circumstance of commission as to constitute a criminal offense or criminal transaction, as those terms are defined in section 40.10 of the criminal procedure law; and
"(c) are either: (i) related to one another through a common scheme or plan or (ii) were committed, solicited, requested, importuned or intentionally aided by persons acting with the mental culpability required for the commission thereof and associated with or in the criminal enterprise.”

. Two of the forgeries alleged as pattern criminal acts refer to the same check.