(May 21, 2009)

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ANTHONY GUARDINO, Appellant. [880 NYS2d 244]—

Judgment, Supreme Court, New York County (Robert H. Straus, J.), rendered February 6, 2007, as amended February 7, 2007, convicting defendant, after a jury trial, of enterprise corruption, combination in restraint of trade and competition in violation of General Business Law §§ 340 and 341, bribe receiving by a labor official (13 counts), grand larceny in the third degree (six counts) and grand larceny in the fourth degree, and sentencing him to an aggregate term of 6 to 18 years, affirmed.

Defendant and eight codefendants, including Local Union No. 8 of the United Union of Roofers, Waterproofers & Allied Workers (Local 8), were charged in a 54 count indictment with, inter alia, enterprise corruption, combination in restraint of trade, bribe receiving by a labor official, grand larceny in the third degree, and grand larceny in the fourth degree. Defendant was the business manager or chief executive of Local 8, and four other codefendants were also labor officials. Two of the codefendants are allegedly members of the Genovese organized crime family.

The enterprise corruption count alleged that, from September 2001 to the date of the indictment, defendants and others, including members of the Genovese crime family, were part of a criminal enterprise referred to as the "Local 8 Group." This group allegedly accepted bribes and extortion payments from roofing contractors in exchange for "labor peace and lenient treatment by union officials who failed to enforce the union collective bargaining agreements on union projects." The alleged pattern of criminal activity included 113 acts of possession of stolen property, money laundering, falsifying business records, labor bribery, extortion, and combination in restraint of trade in violation of the Donnelly Act.

Local 8 and four other defendants entered guilty pleas prior to trial. The remaining defendants, including appellant, proceeded to trial on October 16, 2006. The jury commenced deliberations on December 12, 2006 and reached a verdict on December 18. The jury convicted defendant of enterprise corruption and 21 other felony counts.

Defendant's application pursuant to *Batson v Kentucky* (476 US 79 [1986]) was properly denied. Defendant's argument before the trial court was limited to a numerical argument, i.e., that four of the six black female prospective jurors had been stricken by the prosecutor.* The dissent contends this numerical showing was sufficient to meet defendant's initial burden of demonstrating that these potential jurors may have been challenged for impermissible reasons. A review of the record, however, does not support this conclusion.

Of the six black women in question, four were peremptorily challenged by the People, one was stricken by the defense and one was seated. While a purely numerical argument may give rise to a prima facie showing of discrimination (*see e.g. People v Rosado*, 45 AD3d 508 [2007] [where the prosecutor exercised a peremptory challenge against all four Hispanic panelists remaining in the venire]), numbers alone may not automatically establish such a showing. Even though a prima facie showing of discrimination "may be made based on the peremptory challenge of a single juror that gives rise to an inference of discrimination" (*People v Smocum*, 99 NY2d 418, 422 [2003]), if a numerical argument, in and of itself, fails to raise an inference of discrimination the party raising a *Batson* claim must

---

* Although defendant makes additional arguments concerning age and other background characteristics similar to the black women peremptorily excused by the People, these arguments were not preserved and we decline to review them (*see People v James*, 99 NY2d 264, 270 [2002]; *People v Solares*, 309 AD2d 502, 503 [2003], *lv denied* 1 NY3d 581 [2003]).

present "other facts or circumstances suggesting intentional discrimination" (*People v Harris*, 55 AD3d 503, 504 [2008], *lv denied* 11 NY3d 925 [2009]) in order to meet the first requirement of the three-prong *Batson* analysis.

Here, defendant presented no other factors which would give rise to a suggestion that those jurors were peremptorily challenged for impermissible reasons. His numerical argument "was not so compelling as to warrant a finding of a prima facie case" (*People v Solares*, 309 AD2d at 503) and was "unsupported by factual assertions or comparisons that would serve as a basis for a prima facie case of impermissible discrimination" (*People v Brown*, 97 NY2d 500, 508 [2002]).

The court properly exercised its discretion in denying defendant's requests for a mistrial during the fourth and final day of jury deliberations, following a six-week trial involving complex evidence and charges (*see People v Baptiste*, 72 NY2d 356, 360 [1988]; *Matter of Plummer v Rothwax*, 63 NY2d 243, 250 [1984]). The court properly responded to a series of jury notes, which variously reported a deadlock and asked for additional instructions, by first giving a modified *Allen* charge encouraging a verdict, then a full *Allen* charge, and finally asking the jury to report whether or not, in light of additional instructions concerning applicable law, it wanted to continue deliberating or not. The court cautioned the jurors not to surrender their conscientiously held beliefs, and there was nothing coercive in any of its instructions (*see People v Ford*, 78 NY2d 878, 880 [1991]; *People v Pagan*, 45 NY2d 725 [1978]).

Even though, according to the jury's notes, one juror was unwilling to apply the law to the facts, there was no basis for finding the juror grossly unqualified (*see* CPL 270.35 [1]) simply on the basis of the notes, without making an inquiry. However, defendant never requested any inquiry, but merely reiterated his request for a mistrial. In any event, the apparent problem was resolved after further instructions concerning the law were given to the jury.

A court officer's advice to the jury that a requested item was not available for review because it was not in evidence constituted a ministerial function, and defendant's presence was therefore not required (*see People v Bonaparte*, 78 NY2d 26 [1991]).

The "criminal enterprise" element of the enterprise corruption charge (Penal Law § 460.10 [3]) was supported by ample evidence of labor racketeering committed for a period of over a year by union officials including defendant (*see People v Cantarella*, 160 Misc 2d 8, 14 [Sup Ct, NY County 1993]). Although

the enterprise ended upon the arrests of its members, the continuity requirement was satisfied by evidence that defendant committed predicate criminal acts while "operating as part of a long-term association that exist[ed] for criminal purposes," and had no obvious preplanned termination date (*H. J. Inc. v Northwestern Bell Telephone Co.*, 492 US 229, 243 [1989]; *see also United States v Coiro*, 922 F2d 1008 [2d Cir 1991], *cert denied* 501 US 1217 [1991]). The enterprise, if undetected by law enforcement, could have continued indefinitely.

We have considered defendant's remaining arguments and find them unavailing. Concur—Gonzalez, P.J., Tom, Buckley and Sweeny, JJ.

Catterson, J., dissents in a memorandum as follows: Because I believe that the defendant made a prima facie showing of discrimination pursuant to *Batson v Kentucky* (476 US 79 [1986]), I respectfully dissent.

On July 15, 2004, a grand jury issued a 54-count indictment against the defendant and eight codefendants. Allegedly, from September 2001 to the date of the indictment, the defendants and others, including members of the Genovese organized crime family, were part of a criminal enterprise, referred to as the "Local 8 Group." The alleged purpose of the Local 8 Group was to make money by accepting bribes and extortion payments from roofing contractors, in exchange for "labor peace and lenient treatment by union officials who failed to enforce the union collective bargaining agreements on union projects."

Jury selection began with a preliminary screening process. The court read the indictment and explained the nature of the case. Potential jurors completed lengthy questionnaires. Individuals who believed they could not be fair or could not serve due to the nature of the case were eliminated. The court then ruled on motions to dismiss jurors for cause.

Out of the remaining pool, a panel of 26 individuals were chosen at random for oral questioning. Peremptory challenges were exercised resulting in elimination of 18 jurors and selection of eight jurors.

A second panel of 26 potential jurors was then questioned. After one potential juror was excused for cause by the court, and 11 additional jurors had come up for possible peremptory challenges, the defendant made a *Batson* challenge to the People's use of a peremptory challenge to strike a black female juror. Defense counsel stated, "they bounced every African American female" or "ethnic female," keeping only one black female, who was actually from Surinam in South America.

The court reviewed the peremptory challenges, finding that

the People had exercised a total of 11 perempts, 10 against women, with four being against black women. In response to the defendant's further charge that the People's exercise of perempts had resulted in a virtually all white jury, the court noted that defense counsel had challenged two Hispanic women, an Asian male and a black woman. The record reflects that, of the 11 jurors selected at that point, five were women.

The record further shows that a total of six black females had been on the panels, of which four were peremptorily challenged by the People, one was peremptorily challenged by the defense, and one was empaneled. The court, after ascertaining that the *Batson* challenge was based on a "female black" class, observed that the "case law on the subject is interesting," and ruled that the defense had not presented sufficient facts to make out a pattern of the purposeful use of peremptory challenges against a "recognizable group."

On appeal, the defendant claims that, among other things, the People systematically excluded potential jurors based solely on the fact that they were African American females and that the trial court violated his right to equal protection by failing to request that the People provide a race-neutral reason for their challenges.*

The People argue that the trial court correctly denied the *Batson* motion because the defense failed to meet the threshold requirement of a prima facie showing of discriminatory challenges. Moreover, the People assert that the defendant's claims are unreliable because they are purely statistical and are based on an intersectional status (race and gender).

For the reasons set forth below, I believe that the defendant made out a prima facie case of racial discrimination which required the prosecutor to give racially-neutral reasons for peremptorily excluding four out of the six black female panelists.

The Criminal Procedure Law provides a method (CPL 270.20) for both the prosecution and defense counsel to challenge for cause the selection of a potential juror if it can be shown that bias may prevent that juror from deciding the case impartially.

---

* On appeal, the defendant argues that the *Batson* challenge was based on a class of African American females, not black females, so that one potential juror, the South American woman, who was seated on the jury, could be excluded from the statistical analysis of the prosecution's use of peremptories. In other words, the defendant asserts that the ratio between challenged jurors and accepted jurors is four to one—not four to two. However, the defendant failed to preserve this argument for appeal. As such, I would decline to review the claim.

Additionally, each party may exercise a limited number of peremptory challenges whereby potential jurors are excused without the party having to state a reason. (CPL 270.25; *People v Hernandez*, 75 NY2d 350, 355 [1990], *affd* 500 US 352 [1991].)

In *Batson v Kentucky*, the United States Supreme Court held that the equal protection clause prohibits a prosecutor from exercising peremptory challenges to strike prospective jurors on the basis of race. (476 US at 89.) The Supreme Court has extended the *Batson* rationale to gender. (*J. E. B. v Alabama ex rel. T. B.*, 511 US 127, 130-131 [1994].) In New York, the Court of Appeals has broadly stated "[e]limination of a potential juror because of generalizations based on race, gender or other status that implicates equal protection concerns is an abuse of peremptory strikes." (*People v Allen*, 86 NY2d 101, 108 [1995].)

In any case involving a *Batson* challenge, the court must follow a three-step process in determining whether peremptory challenges have been exercised in a discriminatory manner. (*See People v Allen*, 86 NY2d at 104.) First, the defendant "must allege sufficient facts to raise an inference that the prosecution has exercised peremptory challenges for discriminatory purposes." (*Id.*) If defendant makes a prima facie showing, the "burden shifts to the prosecution to articulate a neutral explanation for striking the jurors in question," and, finally, the trial court must determine whether the proffered reasons are pretextual. (*Id.*)

There are no "fixed rules" for determining whether a prima facie case has been established. (*People v Bolling*, 79 NY2d 317, 323-324 [1992].) The court may consider whether there has been a "pattern of strikes or questions and statements," whether "members of the cognizable group were excluded while others with the same relevant characteristics were not," and whether stricken members of the cognizable group possess background and experience which might otherwise be expected to favorably dispose them to the prosecution. (*People v Childress*, 81 NY2d 263, 267 [1993].)

As an initial matter, it is necessary to address whether a group of black females is a "cognizable racial group," for the purposes of a *Batson* challenge. In my view, the spirit of *Batson* and its progeny requires this Court to recognize peremptory challenges exercised against individuals because of *both* their race and their sex.

The test courts apply to determine whether a class may be cognizable under *Batson* is the test applied in *Castaneda v Partida* (430 US 482 [1977]). Such a group is "one that is a recognizable, distinct class, singled out for different treatment

under the laws, as written or as applied." (*Castaneda*, 430 US at 494.)

In *J. E. B. v Alabama*, the Supreme Court recognized that discriminatory laws historically targeted women and racial and ethnic minorities. The Court stated: " '[T]hroughout much of the 19th century the position of women in our society was, in many respects, comparable to that of blacks under the pre-Civil War slave codes. Neither slaves nor women could hold office, serve on juries, or bring suit in their own names, and married women traditionally were denied the legal capacity to hold or convey property or to serve as legal guardians of their own children . . . And although blacks were guaranteed the right to vote in 1870, women were denied even that right—which is itself "preservative of other basic civil and political rights"— until adoption of the Nineteenth Amendment half a century later.' " (*J. E. B.*, 511 US at 136, quoting *Frontiero v Richardson*, 411 US 677, 685 [1973].)

These discriminatory laws undeniably have created social crosscurrents as old as the laws themselves. Consequently, I believe that the intersectional status at issue here should be treated the same way race and gender are treated under equal protection analysis. (*See People v Garcia*, 217 AD2d 119, 120-122 [2d Dept 1995] [holding that black females are protected from being peremptorily challenged on a discriminatory basis under *Batson*]; *see also People v Jerome*, 34 AD3d 835 [2d Dept 2006] [recognizing hybrid class of black males].)

I agree with the defendant that a "pattern of strikes" against black females was established prima facie. It is well-settled that numerical evidence of discrimination is sufficient to raise a prima facie case under *Batson*. (*See People v Hawthorne*, 80 NY2d 873, 874 [1992] [where the prosecutor peremptorily challenged four of the six African American members of the venire and the court determined that the defendant made a prima facie showing that the prosecution exercised its peremptory challenges in a racially discriminatory manner]; *People v Jenkins*, 75 NY2d 550, 556 [1990] [prima facie "pattern of strikes" established where the prosecutor used only 10 peremptory challenges, seven of which were used to strike seven of the 10 blacks on the venire]; *People v Harris*, 283 AD2d 520 [2001] [the People "established a prima facie case of discrimination" when the "defense counsel peremptorily challenged four of the five remaining white venirepersons in the second round of jury selection"]; *People v Vega*, 198 AD2d 56 [1st Dept 1993], *lv denied* 82 NY2d 932 [1994] [where the People "established a prima facie case of purposeful racial discrimination in the use of peremp-

tory challenges when they established that the defense used 7 of its 8 challenges to exclude all but one of the white persons on the panel of 16"]; *see also People v Rosado*, 45 AD3d 508 [1st Dept 2007] [stating that defendant's numerical argument was sufficient to raise an inference of discrimination even though it was not accompanied by any other evidence].)

In any event, a prima facie showing of discrimination " 'may be made based on the peremptory challenge of a single juror that gives rise to an inference of discrimination' " (*People v McCloud*, 50 AD3d 379, 381 [2008], quoting *People v Smocum*, 99 NY2d 418, 422 [2003]), and the discriminatory exclusion of even a single juror is objectionable. (*See J. E. B. v Alabama*, 511 US at 142.)

Here, the defense counsel raised a *Batson* challenge during the second round of jury selection. At that point, the prosecutor had made a total of 11 challenges, 10 of which were made against females and four of which were made against black females. In other words, four of the six black females that were on the panels were challenged by the prosecution. I believe that these numbers alone are sufficient to raise a prima facie case of jury discrimination requiring some explanation from the prosecutor.

Accordingly, I believe that the appeal should be held in abeyance and the matter should be remitted to the trial court for the prosecution to provide race neutral reasons for their challenges, and if the prosecution cannot do so, the judgment of conviction should be vacated.