[942 NE2d 248, 917 NYS2d 39]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOSEPH HECKER, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ANTHONY GUARDINO, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ERIC HOLLIS, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JAMEL BLACK, Appellant.

Argued October 14, 2010; decided November 30, 2010

**POINTS OF COUNSEL**

*Center for Appellate Litigation*, New York City (*Robert S. Dean* of counsel), for appellant in the first above-entitled action. I. The trial court's reverse *Batson* step-three ruling of "pretext" was unsupported by the record, and clearly erroneous, in light of, inter alia, the flimsiness of the prima facie case, the reasonableness of counsel's explanation for the strike, and the absence of any specific finding of racial discrimination. (*People v Luciano*, 10 NY3d 499; *People v McQuade*, 110 NY 284; *United States v Martinez-Salazar*, 528 US 304; *People v Hernandez*, 75 NY2d 350, 500 US 352; *Georgia v McCollum*, 505 US 42; *People v Kern*, 75 NY2d 638; *Batson v Kentucky*, 476 US 79; *People v Allen*, 86 NY2d 101; *People v James*, 99 NY2d 264; *People v Brown*, 97 NY2d 500.) II. The court violated appellant's right to a public trial when it (a) improperly closed the courtroom during the testimony of the undercover officer, despite insufficient

evidence at the *Hinton* hearing linking his open-court testimony with his fear for his safety; (b) alternatively, even were closure justified by the *Hinton* testimony, the court erred in failing to consider defense counsel's less-restrictive reasonable alternative. (*People v Hinton*, 31 NY2d 71, 410 US 911; *People v Martinez*, 82 NY2d 436; *Waller v Georgia*, 467 US 39; *People v Ramos*, 90 NY2d 490, *cert denied sub nom. Ayala v New York*, 522 US 1002; *People v Nieves*, 90 NY2d 426; *Press-Enterprise Co. v Superior Court of Cal., County of Riverside*, 478 US 1; *People v Jones*, 47 NY2d 409, 444 US 946; *People v Tolentino*, 90 NY2d 867; *People v Cronin*, 60 NY2d 430.)

*Cyrus R. Vance, Jr., District Attorney*, New York City (*Ellen Stanfield Friedman* and *Sylvia Wertheimer* of counsel), for respondent in the first above-entitled action. I. The affirmed finding of the trial court, that defense counsel's peremptory strike of prospective juror Chan was discriminatory, is supported by the record and, therefore, is beyond the scope of this Court's review. (*Batson v Kentucky*, 476 US 79; *People v Wilson*, 64 NY2d 634; *People v Bell*, 63 NY2d 796; *People v Dickerson*, 50 NY2d 937; *People v Concepcion*, 38 NY2d 211; *People v Besser*, 96 NY2d 136; *Georgia v McCollum*, 505 US 42; *People v Kern*, 75 NY2d 638, 498 US 824; *People v Payne*, 88 NY2d 172; *People v Hernandez*, 75 NY2d 350, 500 US 352.) II. The trial court properly closed the courtroom during the undercover officer's testimony. (*People v Hinton*, 31 NY2d 71; *In re Oliver*, 333 US 257; *People v Jelke*, 308 NY 56; *People v Kin Kan*, 78 NY2d 54; *People v Ramos*, 90 NY2d 490, *cert denied sub nom. Ayala v New York*, 522 US 1002; *People v Martinez*, 82 NY2d 436; *People v Jones*, 47 NY2d 409, 444 US 946; *Waller v Georgia*, 467 US 39; *People v Cuevas*, 50 NY2d 1022; *People v Jones*, 96 NY2d 213.)

*Peluso & Touger, LLP*, New York City (*David Touger* of counsel), for appellant in the second above-entitled action. I. The trial court's denial of appellant's prima facie showing of the prosecution's use of racially- and gender-biased peremptory challenges without even requiring a proffer of race-neutral grounds violated appellant's rights to equal protection of the law. (*Batson v Kentucky*, 476 US 79; *People v James*, 99 NY2d 264; *People v Kern*, 75 NY2d 638; *People v Childress*, 81 NY2d 263; *Truesdale v Sabourin*, 427 F Supp 2d 451; *People v Bolling*, 79 NY2d 317; *Jones v West*, 555 F3d 90; *People v Hawthorne*, 80 NY2d 873; *People v Jenkins*, 75 NY2d 550; *People v Vega*, 198 AD2d 56.) II. The appellant's constitutional and statutory right

to a fair and impartial jury verdict was violated by the trial court committing various reversible errors. (*People v Andrews*, 109 AD2d 939; *Allen v United States*, 164 US 492; *Fong v Poole*, 522 F Supp 2d 642; *People v Sheldon*, 136 AD2d 761; *People v Aponte*, 2 NY3d 304; *People v Buford*, 69 NY2d 290; *People v Dukes*, 8 NY3d 952; *People v Harris*, 99 NY2d 202.) III. The prosecution failed to prove the continuity element of the enterprise corruption charge because the organization did not continue to operate after the removal of the appellant. (*People v Cantarella*, 160 Misc 2d 8; *People v Yarmy*, 171 Misc 2d 13.)

*Cyrus R. Vance, Jr., District Attorney*, New York City (*Amyjane Rettew* of counsel), for respondent in the second aboveentitled action. I. As the trial court and the Appellate Division majority found, the defense failed to satisfy the *Batson* threshold requirement of a prima facie showing of purposefully discriminatory challenges. (*People v Hawthorne*, 80 NY2d 873; *People v Butler*, 15 AD3d 415; *People v Chin*, 3 AD3d 574; *People v Irizarry*, 165 AD2d 715; *Batson v Kentucky*, 476 US 79; *People v Stephens*, 84 NY2d 990; *People v McCloud*, 50 AD3d 379; *People v Lebron*, 294 AD2d 105; *United States v Walker*, 490 F3d 1282; *United States v Changco*, 1 F3d 837.) II. Contrary to defendant's claim, there was nothing inconsistent about the verdict and the evidence amply established that the criminal enterprise he ran had the requisite "continuity of existence, structure, and criminal purpose." (*People v Carter*, 7 NY3d 875; *People v Alfaro*, 66 NY2d 985; *People v Satloff*, 56 NY2d 745; *People v Stahl*, 53 NY2d 1048; *People v Tucker*, 55 NY2d 1; *People v Maldonado*, 11 AD3d 114; *People v Filacouris*, 95 NY2d 940; *People v Rayam*, 94 NY2d 557; *People v Loughlin*, 76 NY2d 804; *Dunn v United States*, 284 US 390.) III. The trial judge providently exercised his discretion in rejecting the defense demands for a mistrial and his supplemental instructions in no way coerced the verdict. (*Allen v United States*, 164 US 492; *People v Baptiste*, 72 NY2d 356; *Matter of Rivera v Firetog*, 11 NY3d 501; *Matter of Plummer v Rothwax*, 63 NY2d 243; *Matter of Owen v Stroebel*, 65 NY2d 658; *People v Andrews*, 109 AD2d 939; *People v Henderson*, 50 AD3d 525; *Francolino v Kuhlman*, 224 F Supp 2d 615; *People v Cook*, 52 AD3d 255; *People v Anderson*, 249 AD2d 405, *cert denied sub nom. Anderson v Miller*, 206 F Supp 2d 352, 346 F3d 315.)

*Wachtell, Lipton, Rosen & Katz*, New York City (*Meredith L. Turner* of counsel), and *Office of the Appellate Defender* (*Richard M. Greenberg* and *Daniel A. Warshawsky* of counsel) for

appellant in the third above-entitled action. I. The Appellate Division erred when it held contrary to controlling law and in spite of overwhelming statistical evidence, that Mr. Hollis had failed to satisfy the "minimal" burden of establishing a prima facie case of discrimination during jury selection. (*Batson v Kentucky*, 476 US 79; *People v Payne*, 88 NY2d 172; *People v Allen*, 86 NY2d 101; *People v Jenkins*, 75 NY2d 550; *People v Bolling*, 79 NY2d 317; *Johnson v California*, 545 US 162; *People v Scott*, 70 NY2d 420; *Overton v Newton*, 295 F3d 270; *People v Childress*, 81 NY2d 263; *People v Hernandez*, 75 NY2d 350.) II. The Appellate Division erred when it held that the voir dire record in Mr. Hollis's case, which clearly demonstrated that 100% of the black jurors in the second round were peremptorily struck, was inadequate to review Mr. Hollis's *Batson* claim. (*Batson v Kentucky*, 476 US 79; *Jones v West*, 555 F3d 90; *People v Gray*, 68 AD3d 1131; *People v Hawthorne*, 80 NY2d 873.)

*Cyrus R. Vance, Jr., District Attorney*, New York City (*Jared Wolkowitz, Amyjane Rettew* and *Gina Mignola* of counsel), for respondent in the third above-entitled action. As the trial court and the Appellate Division found, defendant's numerical argument, which rests on only a limited set of facts drawn from only one small part of one single round of the selection process, did not establish a prima facie showing of purposeful discrimination. (*Batson v Kentucky*, 476 US 79; *People v Smocum*, 99 NY2d 418; *People v Brown*, 97 NY2d 500, *affd sub nom. Brown v Alexander*, 543 F3d 94; *People v Allen*, 86 NY2d 101; *People v Childress*, 81 NY2d 263; *Johnson v California*, 545 US 162; *Jones v West*, 555 F3d 90; *Truesdale v Sabourin*, 427 F Supp 2d 451; *People v Bolling*, 79 NY2d 317.)

*Jamel Black*, appellant pro se in the fourth above-entitled action. I. The prosecutor knowingly deceived the court at the *Huntley-Wade* hearing with false answers and knowingly allowed a prosecution witness' false testimony to go uncorrected at trial which violated appellant's federal and state due process rights under the US Constitution 14th Amendment and NY Constitution, article I, § 6. (*Mooney v Holohan*, 294 US 103; *Napue v Illinois*, 360 US 264; *Giglio v United States*, 405 US 150; *People v Savvides*, 1 NY2d 554; *People v Steadman*, 82 NY2d 1; *People v Pelchat*, 62 NY2d 97; *People v Jones*, 31 AD3d 666.) II. Counsel's failure to seek a missing witness charge denied appellant his federal and state rights of effective assistance of counsel. (*People v Wiley*, 120 AD2d 66; *People v Baldi*, 54 NY2d 137; *Strickland v Washington*, 466 US 668; *People v Henry*, 95 NY2d 563; *People v Savinon*, 100 NY2d 192.)

*William G. Kastin,* New York City, and *Lynn W.L. Fahey* for appellant in the fourth above-entitled action. The prosecution's proffered reasons for exercising peremptory challenges against two African-American prospective jurors, that one lived in East New York and was unemployed and that the other was unemployed and lacked a high school diploma, were patently pretextual in violation of *Batson v Kentucky* (476 US 79 [1986]), when they were wholly unrelated to the case and to either prospective juror's ability to serve. (*People v Allen,* 86 NY2d 101; *People v Bolling,* 79 NY2d 317; *Martin v Texas,* 200 US 316; *Norris v Alabama,* 294 US 587; *Neal v Delaware,* 103 US 370; *Miller-El v Cockrell,* 537 US 322; *Purkett v Elem,* 514 US 765; *Snyder v Louisiana,* 552 US 472; *Powers v Ohio,* 499 US 400; *United States v Vasquez-Lopez,* 22 F3d 900.)

*Charles J. Hynes, District Attorney,* Brooklyn (*Seth M. Lieberman, Leonard Joblove* and *Victor Barall* of counsel), for respondent in the fourth above-entitled action. I. The vast majority of defendant's claims regarding the prosecutor's peremptory challenges of two prospective jurors are unpreserved. Furthermore, defendant failed to establish that the prosecutor's race-neutral reasons for challenging those prospective jurors were pretextual. (*Batson v Kentucky,* 476 US 79; *Purkett v Elem,* 514 US 765; *People v Payne,* 88 NY2d 172; *Snyder v Louisiana,* 552 US 472; *People v Luciano,* 10 NY3d 499; *People v Smocum,* 99 NY2d 418; *People v Smith,* 81 NY2d 875; *People v Holloway,* 71 AD3d 1486; *People v Brown,* 295 AD2d 442; *People v Jones,* 284 AD2d 46.) II. Defendant has not preserved his claims regarding the prosecutor's purported misconduct. In addition, the record is insufficient to permit review of those claims. Moreover, even assuming that the prosecutor engaged in the purported misconduct, any such error was harmless. (*People v Lane,* 7 NY3d 888; *People v Angelo,* 88 NY2d 217; *People v Clanton,* 69 AD3d 754; *People v Thompson,* 54 AD3d 975; *People v Hendricks,* 2 AD3d 1450; *People v Jones,* 85 NY2d 998; *People v Voliton,* 83 NY2d 192; *People v Gonzalez,* 193 AD2d 360; *People v Kim,* 91 NY2d 407; *People v Kinchen,* 60 NY2d 772.) III. Defendant received effective assistance of counsel. (*People v Satterfield,* 66 NY2d 796; *People v Baldi,* 54 NY2d 137; *People v Ford,* 86 NY2d 397; *People v Benevento,* 91 NY2d 708; *People v Henry,* 95 NY2d 563; *People v Caban,* 5 NY3d 143; *People v Baker,* 14 NY3d 266; *Strickland v Washington,* 466 US 668; *People v Langhorne,* 60 AD3d 867; *People v Savinon,* 100 NY2d 192.)

*New York Civil Liberties Union Foundation,* New York City

(*Andrew L. Kalloch*, *Corey Stoughton* and *Arthur Eisenberg* of counsel), and *Association of the Bar of the City of New York* (*Karen A. Newirth* of counsel) for New York Civil Liberties Union and another, amici curiae in the fourth above-entitled action. I. Facially-neutral grounds for peremptory challenges that have a disparate impact on protected classes are inherently suspect and should be treated as presumptive surrogates for discrimination at step three of the *Batson* analysis. (*Batson v Kentucky*, 476 US 79; *People v Allen*, 86 NY2d 101; *Hernandez v New York*, 500 US 352; *Purkett v Elem*, 514 US 765; *People v Payne*, 88 NY2d 172; *Snyder v Louisiana*, 552 US 472; *Miller-El v Dretke*, 545 US 231; *People v Mitchell*, 80 NY2d 519; *People v Romance*, 35 AD3d 201, 8 NY3d 926; *Arlington Heights v Metropolitan Housing Development Corp.*, 429 US 252.) II. Even if *Batson v Kentucky* (476 US 79 [1986]) does not compel a recognition of certain factors as presumptive surrogates for discrimination under the US Constitution Fourteenth Amendment's Equal Protection Clause, this Court should find such scrutiny warranted under New York's Equal Protection Clause. (*People v P.J. Video*, 68 NY2d 296; *Rivers v Katz*, 67 NY2d 485; *Bellanca v New York State Liq. Auth.*, 54 NY2d 228; *Sharrock v Dell Buick-Cadillac*, 45 NY2d 152; *People v Isaacson*, 44 NY2d 511; *People v Luciano*, 10 NY3d 499; *People v Kern*, 75 NY2d 638; *People v Allen*, 86 NY2d 101; *People v Langston*, 167 Misc 2d 400.)

## OPINION OF THE COURT

CIPARICK, J.

In *Batson v Kentucky*, the United States Supreme Court formulated a three-step test to assess whether peremptory challenges have been used by a party to exclude potential jurors on the basis of race (*see* 476 US 79, 94-98 [1986]). These four appeals, once again, center on the application of this now-familiar three-step *Batson* protocol. At step one, "the moving party bears the burden of establishing a prima facie case of discrimination in the exercise of peremptory challenges" (*People v Smocum*, 99 NY2d 418, 420 [2003]). Once a prima facie case of discrimination has been established, the burden shifts, at step two, to the nonmoving party to offer a facially neutral explanation for each suspect challenge (*see Hernandez v New York*, 500 US 352, 358-359 [1991]; *People v Allen*, 86 NY2d 101, 104 [1995]). At the third step, the burden shifts back to the moving party (*see Smocum*, 99 NY2d at 422; *People v Payne*, 88 NY2d 172, 183-184 [1996]) to prove purposeful discrimination and "the trial court

must determine whether the proffered reasons are pretextual" (*Allen*, 86 NY2d at 104).

With this framework in place, in *People v Hecker*, we are asked to resolve whether Supreme Court erred in concluding at step three that the reasons offered by defense counsel to exclude one Asian-American prospective juror were pretextual. In *People v Guardino* and *People v Hollis*, the issue presented is whether the defendants in those cases failed to meet their burden in establishing a step one prima facie case of purposeful racial discrimination. Finally, in *People v Black*, we are called upon to determine whether Supreme Court's step three acceptance of the race-neutral reasons proffered by the People in peremptorily challenging three prospective jurors has record support.

## I.

### A. *People v Hecker*

A New York County grand jury indicted Hecker for one count of criminal sale of a controlled substance in the third degree (Penal Law § 220.39 [1]), a class B felony, for allegedly selling three twists of crack cocaine to an undercover police officer.

Hecker proceeded to trial and jury selection commenced in June 2008. At the beginning of jury selection, Supreme Court advised the parties that they each would be given 10 minutes to voir dire the prospective jurors following the court's preliminary examination, but that if either party desired more time to speak with the jurors they should seek permission from the court. Supreme Court's preliminary questions ostensibly consisted of two parts. The first part pertained to the prospective jurors' biographical information while the second part focused on the jurors' legal backgrounds, contact with the criminal justice system, and prior jury service. Supreme Court instructed the prospective jurors to familiarize themselves with the court's questionnaire and those selected from the venire for questioning would be asked to reference the question number and provide the pertinent information.

Jury selection took place over the course of three rounds. During the first round of jury selection, Supreme Court seated 18 panelists for questioning. The parties selected three of these panelists to serve as jurors. Of the remaining 15 panelists, Supreme Court excused five of them for cause while the parties

each utilized five of their 15 peremptory challenges.[1] Defense counsel spoke to 12 of the 18 panelists on the first round. Out of the five panelists peremptorily challenged by defense counsel, she had not questioned three of them. Of these three, one of them had not been addressed by the People either.

In the second round of jury selection, Supreme Court similarly seated 18 prospective jurors and later excused four of them for cause. Two of the remaining 14 panelists seated during this round, Chan and Lee, both of Asian descent, are relevant to this appeal. The following colloquy, in response to the preliminary juror questionnaire, ensued between Chan and Supreme Court:

> "[CHAN]: My name is . . . Chan. I live with my husband in lower Manhattan [sic] and for over 16 years. Number four is my husband is working. I'm not.
>
> "THE COURT: What type of work does your husband do?
>
> "[CHAN]: My husband working a technician. My education, I have a business administration in Associate Degree. Number six, no. Number seven, yes.[2] Number eight, no. Number nine is no. Number ten is no. Number eleven is no. Number twelve is no. Number 13 and 14 is no.
>
> "THE COURT: Thank you."

When it was Lee's turn to answer Supreme Court's questionnaire, he responded narratively to the questions, noting that he was a first-year law student at New York University.

Once Supreme Court completed its preliminary questioning, the parties conducted their voir dire of the second round panelists. Defense counsel questioned only five of the 18 panelists. At the point in time defense counsel had questioned three of these panelists, Supreme Court advised her that she had "one minute left" to complete her voir dire. In her remaining time, defense counsel asked two panelists, including Lee, whether he would hold it against Hecker if he did not testify at trial. Lee responded to this line of questioning as follows:

> "I understand it's his legal right. However, I have

---

1. CPL 270.25 (2) (b) allows each party 15 peremptory challenges where the highest crime charged is a class B felony.

2. Question seven concerned whether a prospective juror had previously served on a trial jury.

some trepidation on whether in the role as a juror I could draw the distinction between fact and law, especially given my legal training. I'm a free-thinking individual with an opinion of what the law is or ought to be. So I'm concerned that unconsciously whether that legal opinion might influence.

"So, while I would consciously attempt to force myself from the recognition of what the law is, I think . . . unconsciously."

Supreme Court intervened at this juncture and the following colloquy between it and Lee occurred:

"THE COURT: I'm failing to understand what you are saying.

"[LEE]: I understand as a juror I'm only supposed to evaluate questions of fact. To me that means questions of credibility. So, if the defendant were not to testify, that would, to me, be some indicator of credibility. However, as a matter of law, the defendant need not self incriminate or testify against himself.

"THE COURT: That's a basic constitutional protection.

"[LEE]: Right.

"THE COURT: . . . . Are you saying you have some difficulty accepting the mandates of the United States Constitution which presumes any person accused of a crime of being innocent?

"[LEE]: No, your Honor.

"THE COURT: Are you saying that you would not be able to, as a person who is aspiring to be an attorney before the bar, afford an individual that presumption and not follow the Court's direction that the People have the burden of proving a person accused of a crime beyond a reasonable doubt?

"[LEE]: No, your Honor, I'm not saying that. I'm saying, as an academic matter, I solely recognize that. And I will strive as humanly as possible and as consciously as possible to draw that distinction. However, I have no control over whatever unconscious biases I develop.

"THE COURT: What sort of unconscious biases would you anticipate?

[LEE]: Just as a matter, I would have some question as to why the defendant wouldn't want to testify.

"THE COURT: I'm certain as a law student you can imagine a host of reasons why a defendant might elect not to testify. The simplest of course is putting the People to their proof. He may not be particularly articulate and a host of other reasons.

"The question is, can you, in your mind, as you said, as an intellectual exercise, put those thoughts out of your mind in doing the job that you would be sworn to do as a juror which is to decide the case on the facts, determine whether the People have proven the case beyond a reasonable doubt, as is their burden, without factoring into that equation the musings, if you will, that you have. Can I have your assurance that you will do that?

[LEE]: Yes."

After this lengthy colloquy, Supreme Court informed defense counsel that her allotted time to speak with the remaining prospective jurors had expired. Supreme Court then directed the parties to consider the qualifications of the first nine of the 18 prospective jurors questioned during this round. After the parties completed their for cause challenges as to the first nine jurors, the People and defense counsel each lodged two peremptory challenges. Defense counsel peremptorily challenged Chan, whom neither she nor the assistant district attorney had questioned.

The parties then evaluated the remaining nine panelists. Defense counsel challenged Lee for cause, reasoning that

"despite [the court's] variety of questions which I think at a point put Mr. Lee in the position of almost an embarrassing position where he began to give answers that seemed to attempt to satisfy whether or not he could be fair and impartial . . . he made it clear that he could not really sit as a juror in this case."

Supreme Court denied the application. Later, defense counsel

peremptorily struck three additional jurors, including Lee. In total, both the People and defense counsel used five of their remaining 10 peremptory challenges during the second round of jury selection.

Defense counsel's choice to strike Lee prompted the People to make a reverse *Batson* challenge.[3] In doing so, the prosecutor highlighted the fact that defense counsel removed the only two Asian jurors questioned thus far. Defense counsel immediately interjected to explain her decision for challenging Lee. She pointed out the controversial nature of Lee's responses to her questions pertaining to Hecker's constitutional right not to testify at his own trial. She reminded Supreme Court of the lengthy colloquy that ensued between it and Lee and suggested that the intensive questioning by Supreme Court "embarrassed" Lee, a law student, into giving answers that he could be fair and impartial. Under these circumstances, defense counsel maintained that, regardless of race, Lee was a "questionable juror for a defense attorney." After these remarks, defense counsel further stated, "I don't think that I have to go any further with respect to juror number one" (meaning Chan).

Supreme Court, finding a pattern of discrimination nonetheless, disagreed and asked defense counsel to articulate race-neutral reasons for peremptorily striking Chan. Defense counsel offered the following explanation:

> "I found her as a person extremely austere in her demeanor and her temperament. I felt that . . . there was nothing about her personality or her life-style which indicated to me that she would not be the kind of individual who might be flexible in her thinking.

> "It seemed to me that she—her husband, I think she said, was a business administrator, if I'm reading my notes correctly. But at the point where I eliminated her because of the brevity of our ability to really question everyone at great length, I was very selective in the short period that I had which was all of ten minutes to try to speak to as many of the 18 people as possible.

---

**3.** Reverse *Batson* challenges relate to "discriminatory practices by defense counsel" (*People v Luciano*, 10 NY3d 499, 502 [2008]) which are likewise unconstitutional (*see Georgia v McCollum*, 505 US 42, 53-54 [1992]; *People v Kern*, 75 NY2d 638, 649-650 [1990]).

"And the short impression that I got of her based upon my questions, in fact, I don't even know if I questioned her, but based upon what answers she gave to anyone . . . I just got the feeling that I could not relate to somebody with her temperament."

The People did not respond to defense counsel nor did they specifically challenge this reason as pretextual and Supreme Court reserved its decision on the matter.

After a lunch recess, Supreme Court ruled on the People's reverse *Batson* application. While accepting the race-neutral reasons offered by defense counsel for striking Lee, it concluded as to Chan that "the reasons articulated by counsel [were] pretextual in nature and, in point of fact, there exists no differentiation in my view between this juror's responses and that of any of the other jurors which were found acceptable by counselor." In granting the People's reverse *Batson* application as to Chan, Supreme Court further stated, "[t]he reasons as given . . . such as austere personality, lifestyle, lack of flexibility, are not conclusions which would flow from the answers given by this particular prospective juror."

Defense counsel protested Supreme Court's ruling and argued that no pattern of discrimination had been established since "we're speaking about one individual juror." She further contended that Supreme Court's ruling was erroneous in light of the way she exercised her other peremptory challenges during the first two rounds of jury selection. Defense counsel also renewed her argument that the limited time Supreme Court had allotted during this round of jury selection prevented her from speaking to most of the panelists. She proposed that, given the restricted time constraints of her voir dire, the court should allow her to question Chan further. Supreme Court did not reopen the voir dire as to Chan. Thus, at the completion of the second round, the parties agreed upon four more jurors and Supreme Court empaneled Chan over defense counsel's objection.

The jury selection process proceeded to a third round where Supreme Court seated 26 new panelists for questioning. The parties selected the remaining four jurors from this group. The eighth person seated during this round of jury selection was Choy, who spoke Chinese and whose husband was a police officer in Lower Manhattan. She explained that she would be sympathetic to police testimony and would not be able to be fair and impartial. When defense counsel exercised a for cause

challenge as to this juror, Supreme Court granted the application on consent of the People. Kazuko was the thirteenth person seated during this round of jury selection. During the preliminary questioning, she told Supreme Court and the parties that she received her bachelor's degree in Japan and that she coordinated tours for Japanese tourists in New York City. The parties chose Kazuko to serve as a juror in this case. Prior to Kazuko's selection, defense counsel exercised three additional peremptory challenges, all on individuals she had not questioned during her brief voir dire. Two of these three prospective jurors had likewise not been questioned by the People.

The parties designated three panelists to act as alternate jurors in this case. Alternate juror number two was Qu. During Supreme Court's preliminary questioning, he informed the parties that he earned his university degree in Beijing and that he currently is the host for a "[c]ulture for Chinese language" television and radio program.

The following day, before the People began calling their trial witnesses, Supreme Court presided over a *Hinton* hearing at which the undercover officer testified. Following the hearing, Supreme Court ordered the closure of the courtroom to the public during the undercover's testimony, reasoning that the officer "demonstrated a justifiable fear for his personal safety." Supreme Court also permitted the undercover to use his shield number as opposed to his name to identify himself at the hearing.

The jury convicted defendant of third degree criminal sale of a controlled substance. Supreme Court sentenced defendant to a determinate prison term of six years, followed by a two-year period of postrelease supervision.

The Appellate Division unanimously affirmed the judgment of conviction and sentence, concluding that "[t]he court properly granted the People's *Batson* application" (68 AD3d 429, 430 [1st Dept 2009]). The court further noted that "[c]ounsel's failure to question the panelist was a significant indicator of pretext under the circumstances" (*id.*). In affirming the conviction, the court also held that closure of the courtroom during the undercover's testimony was proper (*see id.*).

A Judge of this Court granted defendant leave to appeal (14 NY3d 801 [2010]) and we now reverse.

## B. *People v Guardino*

A New York County grand jury returned a multiple-count indictment charging Guardino and others with enterprise corruption (Penal Law § 460.20 [1] [a]), a class B felony, combination in restraint of trade and competition (General Business Law §§ 340, 341), and several counts of both bribe receiving by a labor official (Penal Law § 180.25) and grand larceny in the third degree by extortion (Penal Law § 155.35). From September 2001 to the date of the 2004 indictment, Guardino, a business agent for Local Union No. 8 of the United Union of Roofers, Waterproofers and Allied Workers (Local 8), allegedly approached a series of roofing contractors and extorted money from them. Before trial, four of Guardino's codefendants and Local 8 itself entered guilty pleas.

Guardino and his three remaining codefendants proceeded to trial in October 2006. The jury selection process, given the complexity and expected two-month length of the trial, began with the preliminary screening of a large pool of prospective jurors. These prospective jurors received a detailed questionnaire, which they were instructed to complete. The parties reviewed these submissions and Supreme Court excused those prospective jurors who believed they could not be fair or could not serve because of the nature of the case.

Jury selection proceeded over the course of two rounds. Supreme Court seated 26 jurors in each round. Following the questioning of the panelists by the parties, Supreme Court removed one prospective juror for cause from each round.

The 12-person jury selected by the parties consisted of seven males and five females. By the time the parties had agreed upon this jury, 37 prospective jurors—25 from the first round and 12 from the second round—were subject to peremptory challenges. The 37 panelists subject to these peremptory challenges comprised 15 males and 22 females. The People used 12 of their 15 peremptory challenges and struck 11 of the 22 females. Six of the 22 females questioned were African-American. The People peremptorily struck four of the six. It is notable that neither defendant nor the three other defendants who went to trial were black or female.

Guardino's counsel made a *Batson* challenge immediately after the People utilized one of their peremptory challenges to strike a fourth African-American female. He asserted that the People had eliminated all but one of the African-American

females thus far in the jury selection process. Co-counsel asserted "there's a broader pattern of all females, but certainly . . . a distinct pattern of female black" and "[j]ust even 80 percent would . . . I think, qualify under Batson." Finally, Guardino's counsel said, "we have virtually an all white jury. The challenges have been used [by the prosecutor] to remove people of color, all of them."

After all defense counsel made their initial arguments, Supreme Court clarified that the asserted cognizable class formulating the basis of the *Batson* challenge was black and female. Once defense counsel confirmed this, Supreme Court corrected a misstatement made by the defense that the People had eliminated all but one of the black female panelists, noting for the record that it was the defense—and not the People—who peremptorily struck one of these African-American females. As for the assertion that the People used their peremptory challenges to create an all-white jury, Supreme Court counted that seven of the 11 females peremptorily struck by the People were white. Moreover, Supreme Court highlighted the fact that defense counsel had exercised some of their peremptory challenges to remove, in addition to one African-American female, other people of color. Upon reviewing the relevant data, Supreme Court denied defendants' *Batson* application, reasoning that there had "not been presented to me sufficient facts to make out a pattern of the purposeful use of peremptory challenges . . . which include a [ ]cognizable group."

The parties finished selecting the jury with five alternate jurors from the remaining 13 second round panelists. The defense neither made a record of the racial composition of these panelists nor did they renew their *Batson* application. The record only reveals that three of the alternates chosen were female while the other two were male. The People peremptorily struck one male and one female during this process while the defense used five peremptory challenges to strike two males and three females.

At trial, the People called a series of witnesses, including a cooperating contractor and an undercover police officer, who testified about how Guardino had continuously threatened them with reprisals from 2001 to the date of the indictment in order to extort monthly cash payments. The jurors also reviewed hundreds of recorded conversations of Guardino making the same type of threats. There was also evidence adduced at the trial that defendant shared the proceeds of his extortionate efforts with his various accomplices.

After a nearly two-month trial, the jury began its deliberations. Before the jury rendered its verdict, it sent a series of notes indicating that it was deadlocked. After receiving one of these notes, Supreme Court spoke to the jurors and instructed them to continue their deliberations, commenting that it was "not uncommon for a jury that starts deliberating to have difficulty initially in reaching a unanimous decision."

When additional deadlock notes from the jury were received, co-defense counsel made several requests to the court to declare a mistrial. Supreme Court denied these mistrial motions. Instead, it first delivered a modified *Allen* charge to the jury and later a formal *Allen* charge. During the fourth day of deliberations, the jury found Guardino guilty of enterprise corruption and 21 other related felony counts.[4] He was sentenced to serve an indeterminate term of 6 to 18 years in prison.

The Appellate Division, with one justice dissenting, affirmed the judgment of conviction and sentence, concluding that there was "ample evidence of labor racketeering committed for a period of over a year by union officials including [Guardino]" (62 AD3d 544, 546 [1st Dept 2009]). The court also held that Supreme Court properly denied Guardino's *Batson* application because his numerical arguments were insufficient to establish a prima facie case of purposeful discrimination. The court further found that Supreme Court's responses to the jury during its deliberations and its denial of Guardino's mistrial motions were proper.

A single Justice dissented solely on *Batson* grounds. The dissent concluded that Guardino met his prima facie burden in establishing discrimination where the prosecutor struck four of the six black female panelists. Accordingly, the dissenting Justice would have held the appeal in abeyance and remitted the matter to Supreme Court for "the prosecution to provide race neutral reasons for their challenges, and if the prosecution cannot do so, the judgment of conviction should be vacated" (62 AD3d at 551). The dissenting justice granted defendant leave to appeal and we now affirm.

### C. *People v Hollis*

A New York County grand jury indicted Hollis for one count of criminal sale of a controlled substance in the third degree

---

4. The jury acquitted two of Guardino's codefendants on all counts. The jury convicted Guardino's other codefendant of some counts including four counts of bribe receiving.

(Penal Law § 220.39 [1]), a class B felony, for allegedly selling one $20 bag of crack cocaine to an undercover police officer.

Hollis, an African-American male, proceeded to trial and jury selection commenced in July 2005. Jury selection took place over the course of three rounds. During the first round, Supreme Court seated 20 prospective jurors for questioning and later excused seven of them for cause. Of the remaining 13 panelists, the parties agreed upon four jurors. The People used four of their 15 peremptory challenges during this round while the defense peremptorily challenged five panelists.

Supreme Court seated another 20 prospective jurors in the second round and later excused eight of these panelists for cause. Of the remaining 12 panelists, the parties agreed upon six more jurors. The People and the defense each exercised three peremptory challenges during this round. The People utilized two of their peremptory challenges during this round by striking African-American panelists.

Defense counsel responded with a *Batson* challenge. Supreme Court asked defense counsel the basis for his challenge, to which he replied "[the People] excluded the only remaining black people left on this jury." The prosecutor interrupted and informed Supreme Court that he had legitimate reasons outside of race for striking these prospective jurors.

Supreme Court, however, determined that "[t]he first order of business is has a prima facie case been established"? Defense counsel argued that it was simply "a question of numbers" and that he established a prima facie case because the People had eliminated the only two black people on this particular panel. Supreme Court denied defense counsel's *Batson* application. It ruled that a prima facie case had not been set forth "at this juncture," but that defense counsel could renew his *Batson* application "later on."

In the third and final round of jury selection, the parties agreed upon the remaining two jurors and selected four alternate jurors. Supreme Court also seated 20 prospective jurors during this round, later excusing five of them for cause. The People exercised one additional peremptory challenge while defense counsel peremptorily struck two panelists before they ultimately selected the 12-person jury. The parties considered six panelists to fill the four alternate slots. The People exercised two peremptory challenges during this process. Defense counsel did not renew his *Batson* application at the completion of jury

selection. The racial composition of the 20 panelists seated during the third round and the uncalled prospective jurors who remained in the venire is unknown. Although defense counsel did not specifically note the racial composition of the 20 panelists seated in the first round of jury selection, he did not allege that the People peremptorily struck African-American panelists, if any, seated in that round.

The jury convicted Hollis of third degree criminal sale of a controlled substance. He was sentenced to an indeterminate term of imprisonment of 4½ to 9 years.

The Appellate Division unanimously affirmed the judgment of conviction and sentence. Specifically, the court concluded that Hollis failed to "produce evidence sufficient to permit [Supreme Court] to draw an inference of discrimination" and further noted that "defendant declined [Supreme Court's] offer of an opportunity to renew the application at a later juncture" (63 AD3d 409, 410 [1st Dept 2009]).

A Judge of this Court granted defendant leave to appeal (13 NY3d 860 [2009]) and we now affirm.

### D. *People v Black*

A Kings County grand jury indicted defendant for robbery in the first degree (Penal Law § 160.15 [4]), a class B felony, and other related charges for his alleged involvement in an incident that took place in October 2004 at a grocery store in Brooklyn. The same grand jury also indicted Black for criminal possession of a weapon in the third degree (former Penal Law § 265.02 [4]) for his alleged possession of a loaded firearm in November 2004.

Black, an African-American male, proceeded to trial and jury selection commenced in March 2006. Jury selection took place over the course of two rounds. The 12-person jury agreed upon by the parties consisted of five African-American individuals, five white individuals, and one juror of Asian descent. The record does not reflect the race of the twelfth juror. The parties also selected three alternate jurors, one African-American and two white individuals.

During the first round of jury selection, Supreme Court seated 17 jurors for questioning, later removing two of those panelists for cause. The People also challenged a third panelist from this round, Petion, for cause. When the People asked her during voir dire whether she would have a problem convicting Black even if they met their burden of proof, Petion hesitated and then

replied, "I may." In his portion of the voir dire, defense counsel questioned Petion as well and she told him that she could follow the judge's instructions and return a guilty verdict if the People proved every element of the crimes charged. Satisfied that Petion could be impartial, Supreme Court denied the People's for cause challenge. Thus, the remaining 15 panelists in this round were subject to the parties' peremptory challenges. The People exercised six of their 15 peremptory challenges in the first round, utilizing one of these strikes to remove Petion who was African-American.

When lodging their peremptory challenges during this first round, Supreme Court asked the parties initially only to consider the first 12 jurors. The People peremptorily struck five of the first 12 jurors, using these challenges to strike four African-American panelists (including Petion) and one white panelist. The record reveals that seven of the first 12 panelists were African-American. The parties selected five jurors from this first group of 12—three African-American jurors, a white juror, and a juror of an unknown race, but not black.

The People's removal of four of the seven African-American prospective jurors prompted defense counsel to assert a *Batson* challenge as to this cognizable group. Supreme Court asked defense counsel to articulate the basis for his application. Defense counsel responded that the four black jurors struck by the People "indicated [during voir dire] that they could be fair, that they could be impartial, that they could follow the judge's instructions on the law, even if they were in disagreement with it."

With the exception of Petion, Supreme Court found that the defense had established a prima facie case of discrimination against the other three prospective jurors—Gordon, Williams, and Thomas. The People disagreed with Supreme Court's prima facie finding, pointing out that seven of the first 12 jurors were "apparently African Americans." Supreme Court, nonetheless, adhered to its original prima facie ruling and asked the People to state their race-neutral reasons for striking these prospective jurors.

The People's reasons for striking Gordon were twofold: she was unemployed and lived in East New York, the neighborhood adjacent to the crime scene. The People peremptorily struck Williams because she had not completed high school and was also unemployed. As for Thomas, the People perceived that his

overall demeanor during voir dire was disrespectful. The People noted, among other things, Thomas' slouched appearance and his attire.

Supreme Court determined that the reasons advanced by the People were race neutral and invited defense counsel to argue why it should find these reasons to be pretextual. First, defense counsel noted that East New York is the largest "identifiable neighborhood" in Brooklyn and nothing about Gordon's answers in voir dire suggested that she lived near the vicinity of the crime scene. Next, defense counsel asserted that the unemployment status of Gordon and Williams should not be held against them in evaluating their qualifications to serve as jurors. As to Thomas, defense counsel suggested that his manner of dress was consistent with that of other young black males. Defense counsel, in an effort to explain Thomas' appearance, also reminded Supreme Court that Thomas had never served on a jury or been in a courthouse before. In arguing that the People's race-neutral reasons were pretextual, defense counsel never asserted that similarly situated non-black prospective jurors were treated more favorably by the People.

Supreme Court weighed the reasons set forth by the People and defense counsel's arguments and ruled that the People's reasons for striking these prospective jurors were nonpretextual. Supreme Court specifically observed that Thomas "did seem to have a body-language problem with the district attorney when responding to [his] questions." Although Supreme Court did not mention these facts in its ruling, a review of the record reveals that of the first 12 prospective jurors, all but Gordon and Williams and a third prospective juror, Solomon, were employed. The record also establishes that all of the first 12 prospective jurors other than Williams and Solomon completed high school. Solomon, an African-American woman not challenged by the People, was the third juror selected by the parties. Although she answered that she was currently unemployed, she informed Supreme Court and the parties that she had worked as a home health aide for 22 years.

After Supreme Court denied defense counsel's *Batson* application, the parties completed the first round of jury selection. The People peremptorily struck one of the three remaining panelists in round one. In round two, the final round, the People utilized two of their remaining nine peremptory strikes. The parties considered four panelists in order to choose three alternate jurors. The People peremptorily struck one of these panelists

while the other three were agreeable to both parties. The racial composition of the four prospective jurors peremptorily struck by the People after the denial of the *Batson* challenge is unknown, but the record reflects that defense counsel did not renew his application at a later point. Of the seven jurors selected following the *Batson* challenge, five of the seven were currently employed. As for the other two jurors, one had retired after working for 53 years and the other was in college earning her nursing degree. Of these seven jurors, the record establishes that five of them had at least a high school education. One of the jurors, employed in child care, went to high school through the 11th grade. The juror who retired after 53 years of various employment did not discuss his educational background. The three alternate jurors were likewise employed. Two of the alternate jurors had at least a college education. The third alternate juror did not disclose his schooling.

The jury convicted Black of first degree robbery, third degree criminal possession of a weapon, and other related charges. He was sentenced to consecutive sentences of 24 years imprisonment on the robbery count and seven years imprisonment on the weapons count. Supreme Court also imposed a five-year period of postrelease supervision.

The Appellate Division, with one justice dissenting, affirmed the judgment of conviction and sentence. Specifically, the court concluded that "[Black] failed to satisfy his burden of demonstrating discrimination by showing that [the race-neutral reasons offered by the People] were pretextual" (65 AD3d 1370, 1371 [2d Dept 2009]). A single justice dissented on the grounds that the race-neutral reasons given by the People "bore no relation to the facts of the case" and were, therefore, per se pretextual (*id.* at 1372).

A Judge of this Court granted defendant leave to appeal (13 NY3d 937 [2010]) and we now affirm.

## II.

Jury service is a civil right, rooted in our State Constitution and protected by statute (NY Const, art I, §§ 1, 11; Civil Rights Law § 13). Both "a privilege and duty of citizenship," jury service is "a fundamental means of participating in government" (*Allen*, 86 NY2d at 108; *see Kern*, 75 NY2d at 651-652). Equally axiomatic is a defendant's right to trial by an impartial jury (NY Const, art I, § 2; US Const 6th, 14th Amends; *see People v Johnson*, 94 NY2d 600, 610 [2000]). To that end, the Criminal

Procedure Law permits each party to exercise an unlimited number of for cause challenges where a prospective juror "has a state of mind that is likely to preclude him from rendering an impartial verdict based upon the evidence adduced at the trial" (CPL 270.20 [1] [b]).

Our Legislature has also provided litigants in criminal actions the right to exercise, based upon the degree of crime charged, a limited number of peremptory challenges (*see generally* CPL 270.20 [2]). CPL 270.25 (1) states that "[a] peremptory challenge is an objection to a prospective juror for which no reason need be assigned. Upon any peremptory challenge, the court must exclude the person challenged from service." Long recognized as "a means to achieve the end of an impartial jury" (*Ross v Oklahoma*, 487 US 81, 88 [1988]), peremptory challenges afford each side an opportunity to generalize about the potential biases of prospective jurors and strike those who, regardless of the evidence, seemingly will be unfavorable to their position at trial (*see also Holland v Illinois*, 493 US 474, 484 [1990]).[5]

There are, of course, limitations to the practice of peremptory challenges. In its seminal ruling in *Batson*, the United States Supreme Court held that "the Equal Protection Clause forbids [a] prosecutor to challenge potential jurors solely on the account of their race" (476 US at 89). Following the Supreme Court's initial pronouncement in *Batson*, the Equal Protection Clauses of the Federal Constitution and our State Constitution have been interpreted to prohibit both the People and the defense from exercising peremptory challenges in a racially discriminatory manner (*see McCollum*, 505 US at 53-54; *Luciano*, 10 NY3d at 502-503; *Kern*, 75 NY2d at 649-650). The holding in *Batson* has also been construed to apply to gender (*see J. E. B. v Alabama ex rel. T.B.*, 511 US 127, 129 [1994] ["gender, like race, is an unconstitutional proxy for juror competence and impartiality"]).

### III.

As stated earlier, *Batson* sets forth a three-step procedure to assess a claim of discrimination during the jury selection process. We begin our analysis of each appeal with a discussion of the step one prima facie case. At step one, the moving party

---

5. Nonetheless, the use of peremptory strikes in criminal actions has been subject to some criticism (*see e.g. Allen*, 86 NY2d at 109 n 2).

bears the burden of establishing a prima facie case that the nonmoving party has intentionally used its peremptory challenges to discriminate against a cognizable group (*see Smocum*, 99 NY2d at 419-420; *People v Brown*, 97 NY2d 500, 507-508 [2002]; *Allen*, 86 NY2d at 109; *People v Childress*, 81 NY2d 263, 266 [1993]). In *Allen*, we recognized the logic in placing the initial burden on the moving party, since the nonmoving party need not give a reason for peremptorily striking a prospective juror (*see* 86 NY2d at 109; CPL 270.25 [1]).

In *Johnson v California* (545 US 162 [2005]), the United States Supreme Court held that the first-step burden in a *Batson* challenge is not intended to be onerous (*see id.* at 170; *see also Jones v West*, 555 F3d 90, 96 [2d Cir 2009]). Indeed, "demonstrating that members of a cognizable . . . group have been excluded . . . is seldom problematic" (*Childress*, 81 NY2d at 266). The more difficult component of the prima facie case, however, is the moving party's burden to set forth "facts and other relevant circumstances" to support an inference of discrimination (*id.*; *see Batson*, 476 US at 96-98). Thus, while a party may make a *Batson* application at any time—and even after only one strike (*see People v Bolling*, 79 NY2d 317, 321 [1992])—we have cautioned that purely numerical or statistical arguments are "rarely conclusive in the absence of other facts or circumstances" to give rise to an inference of discrimination (*Brown*, 97 NY2d at 507; *see Childress*, 81 NY2d at 267; *see also Overton v Newton*, 295 F3d 270, 278 [2d Cir 2002]).

In establishing a prima facie case, "[t]here are no fixed rules for determining what evidence will give rise to an inference" of discrimination (*Bolling*, 79 NY2d at 323-324; *see also Brown v Alexander*, 543 F3d 94, 101 [2d Cir 2008]). Rather, a party meets its burden when "the totality of the relevant facts gives rise to an inference of discriminatory purpose" (*Batson*, 476 US at 94). For example, "[group] identity between the defendant and the excused [prospective jurors] might in some cases be the explanation for the prosecution's adoption of the forbidden stereotype," and, therefore, may "provide one of the easier cases to establish both a prima facie case and a conclusive showing that wrongful discrimination has occurred" (*Powers v Ohio*, 499 US 400, 416 [1991]). Other relevant factors, though not exhaustive, that a trial court should consider include:

> "A pattern of strikes or questions and statements made during the voir dire may be sufficient in a

particular case. Additionally, this element may be established by a showing that members of the cognizable group were excluded while others with the same relevant characteristics were not. Another legally significant circumstance may exist where the [party] has stricken members of this group who, because of their background and experience, might otherwise be expected to be favorably disposed to the [party]" (*Childress*, 81 NY2d at 266-267 [citations omitted]).

Once a party has placed its race-neutral reasons on the record, however, the sufficiency of the prima facie showing becomes "moot" (*Smocum*, 99 NY2d at 422; *People v James*, 99 NY2d 264, 270 [2002]; *Payne*, 88 NY2d at 182). We have consistently held that "to revisit the adequacy of the step one showing unnecessarily evades the ultimate question of discrimination" (*Smocum*, 99 NY2d at 422, quoting *Durant v Strack*, 151 F Supp 2d 226, 236 [ED NY 2001] [brackets and internal quotation marks omitted]). First pronounced by the United States Supreme Court in *Hernandez* (*see* 500 US at 359), we, as well as an overwhelming majority of the Federal Circuit Courts of Appeals, have recognized that this doctrine effectuates *Batson*'s ultimate purpose—"to provide assurance . . . that criminal judgments are not tainted by invidious discrimination" (*Johnson v Love*, 40 F3d 658, 665 [3d Cir 1994]; *see e.g. Jordan v Lefevre*, 206 F3d 196, 200 [2d Cir 2000] [in the absence of a prima facie showing, "a trial court's duty at the third stage (is) to determine the credibility of the proffered (race-neutral) explanations"]; *cf. United States v Stewart*, 65 F3d 918, 924-925 [11th Cir 1995]). Accordingly, while we "underscore the importance . . . of *Batson*'s well-articulated, sequential steps" (*Smocum*, 99 NY2d at 423), we will continue to apply the "mootness doctrine" to our *Batson* jurisprudence.

In *Hecker* and in *Black*, the trial courts proceeded to steps two and three of the *Batson* test. Therefore, we will only examine the step one findings made by Supreme Court in *Guardino* and *Hollis*.

### A. *People v Guardino*

Applying these standards to *Guardino*, Supreme Court properly held that the defense failed to meet its step one burden of establishing a prima facie case. Here, co-defense counsel raised a *Batson* challenge alleging that the People impermissibly

used their peremptory challenges to exclude four African-American females from the jury. In doing so, co-defense counsel alleged that the People used their challenges to create an "all white jury" by eliminating females generally and by excluding all but one of the black female panelists subject to peremptory challenges. The defense made no record of the racial or gender composition of the remaining venire nor did they articulate other facts or circumstances that, in their view, gave rise to an inference of discrimination.

Evaluating the numerical assertions set forth by the defense, Supreme Court corrected the record, noting that it was the defense who had actually struck one of the African-American female panelists. Moreover, Supreme Court observed that of the 11 females that the People peremptorily struck, seven of them were white. Based on these findings, Supreme Court denied the *Batson* application. Indeed, at the time of the *Batson* challenge, 37 jurors—15 male and 22 female—were subject to the parties' peremptory challenges. Six of these females were African-American. The People used 11 of their 12 peremptory challenges to remove females, four of whom were African-American. The 12-person jury ultimately selected by the parties from this group consisted of five females, one of whom was African-American.

Thus, this is not the type of case where mere numerical assertions alone will give rise to a mandatory inference of discrimination. Most obviously, Guardino did not and could not assert that the People engaged in a wholesale exclusion of all the African-American women seated in the two panels. This case contrasts with the many cases where this Court and the United States Supreme Court have held that total exclusion of a cognizable group would give rise to an inference of discrimination (*see e.g. Johnson*, 545 US at 166 ["all of the prospective black jurors had been stricken from the pool"]; *Batson*, 476 US at 100 [prima facie case established where prosecutor excluded all four black prospective jurors from the venire]; *People v Hernandez*, 75 NY2d 350, 353 [1990] [the removal of the only four Latino jurors out of a 63-person venire gives rise to a prima facie case]; *People v Scott*, 70 NY2d 420, 425 [1987] ["defendant established a prima face claim that the prosecution used its peremptory challenges to exclude (all five) blacks (in the venire) from her petit jury"]).

In cases where we have sustained a prima facie showing of purposeful discrimination absent a 100% exclusion rate of a cognizable group, the moving party has placed other factors on the

record to meet the step one burden. On this point, the facts in *Bolling* are illuminating. In that case, the defendant, an African-American male, pointed to numbers that revealed that of the five peremptory challenges utilized by the People, they struck four of the five potential African-American jurors (*see Bolling*, 79 NY2d at 322). There, in making a successful prima facie showing, the defendant not only highlighted this statistical argument to the trial court, but augmented his showing by noting that two of the four excluded jurors had pro-prosecution tendencies with "ties to law enforcement" (*id.*).

In contrast, in *People v Steele*, a companion case decided along with *Bolling*, we concluded that the mere statistical fact that the People used 75% of their challenges to strike 50% of the prospective African-American jurors was not sufficient to meet the prima facie threshold (*see id.* at 325; *see also People v Jones*, 284 AD2d 46, 47 [1st Dept 2001] [reliance on numbers alone insufficient to establish a prima facie case, but rather "depends on proof of facts and circumstances"]). Here, like the defendant in *Steele*, Guardino did not articulate additional factors as part of his step one prima facie showing.

Moreover, one of the factors that is relevant to a court's prima facie determination, in the context of a *Batson* challenge raised by the defense, is whether a defendant is a member of the same cognizable group the People are aiming to exclude (*see Powers*, 499 US at 416). Guardino and his three codefendants were white males while the purported cognizable group asserted by their *Batson* challenge was "black females." Although we fully acknowledge that the United States Supreme Court has disposed of the standing requirement, which previously compelled defendants to show that they were a member of the same cognizable class challenged by the prosecution (*see Batson*, 476 US at 96), the Supreme Court, nevertheless, emphasized that it remains a factor in evaluating whether the totality of the circumstances gives rise to a showing of purposeful discrimination (*see Powers*, 499 US at 429). In evaluating this factor, we note that the defense neither argued that the People treated the four African-American challenged panelists disparately vis-à-vis the unchallenged prospective jurors nor did they suggest that the People excluded this cognizable group because they would, for some reason, be more favorably disposed to the defense position.

In sum, because the numerical arguments alone advanced by Guardino did not give rise to a prima facie case of impermissible

discrimination, we conclude Supreme Court properly denied his *Batson* application.

### B. *People v Hollis*

The facts alleged by the defense to support a prima facie case of racial discrimination in *Hollis* likewise rested solely on numerical grounds. In this case, Hollis, an African-American male, asserted a *Batson* challenge during the second round of jury selection, following the People's removal of the only two African-American panelists considered in that particular round. Although the People in *Hollis* immediately indicated that they could specify their race-neutral reasons for striking these prospective jurors, Supreme Court reminded the parties that it first had to resolve whether a prima facie case of discrimination had been established. To that end, defense counsel simply contended that it was "a question of numbers." Notably, defense counsel did not make a record of the racial composition of the remaining venire nor did he argue that the People peremptorily struck African-American prospective jurors seated during the first round.

█ Furthermore, defense counsel did not enumerate any other factors supporting an inference of discrimination. In accordance with our precedent, Supreme Court denied the motion, concluding that a prima facie case had not been set forth "at this juncture." Supreme Court, however, specifically advised defense counsel that he could renew his *Batson* challenge at a later point if he saw fit. At the conclusion of the voir dire, defense counsel elected not to renew his *Batson* challenge. Therefore, since Hollis failed to meet his step one burden of establishing a prima facie case of impermissible discrimination, Supreme Court's denial of the *Batson* application was entirely proper.

### IV.

█ Having completed our analysis of the step one *Batson* procedure, we now examine steps two and three of this tripartite test. Once a prima facie case of impermissible discrimination has been established, the burden shifts, at step two, to the opposing party to set forth a race-neutral reason for each of the stricken jurors (*Hernandez*, 500 US at 358-359). A race-neutral reason naturally "means an explanation based on something other than the race of the juror" (*id.* at 360). In *Smocum*, we held that "[i]f the nonmovant cannot meet this burden, an equal

protection violation is established. However, once race-neutral reasons are given, the inference of discrimination is overcome. At this second stage the reasons need be only facially permissible" (99 NY2d at 422).

If the explanations proffered by the nonmoving party are race neutral, the burden then shifts back, at step three, to the moving party to "persuad[e] the court that reasons are merely a pretext for intentional discrimination" (*id.*; *Payne*, 88 NY2d at 183-184). "It is therefore the moving party's burden to make a record that would support a finding of pretext" and a trial court must make its "ultimate determination on the issue of discriminatory intent based on all of the facts and circumstances presented" (*Smocum*, 99 NY2d at 422). Moreover, as the Supreme Court explained in *Purkett v Elem* (514 US 765 [1995]),

> "At . . . stage [three], implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination. But to say that a trial judge *may choose to disbelieve* a silly or superstitious reason at step three is quite different from saying that a trial judge *must terminate* the inquiry at step two when the race-neutral reason is silly or superstitious. The latter violates the principle that the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike" (*id.* at 768).

The *Batson* inquiry "vests the trial judge with broad discretion to determine the parties' credibility" (*Luciano*, 10 NY3d at 505). "Credibility can be measured by, among other factors, the [demeanor of the opposing party]; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy" (*Miller-El v Cockrell*, 537 US 322, 339 [2003]; *see also Snyder v Louisiana*, 552 US 472, 477 [2008] [demeanor of attorney who exercises peremptory challenges often the best evidence of impermissible discrimination]).

Accordingly, this third-step inquiry is a "pure issue of fact," and the trial court's determination whether a proffered race-neutral reason is pretextual is accorded "great deference" on appeal (*Miller-El*, 537 at 339, 340). "Deference is necessary because a reviewing court, which analyzes only the transcripts from *voir dire*, is not as well positioned as the trial court is to make credibility determinations" (*id.* at 339; *see also Smocum*,

99 NY2d at 422 [a step three "determination is a question of fact, focused on the credibility of the race-neutral reasons"]). Thus, a trial court must establish a meaningful record for a reviewing court to uphold its ruling (*see Payne*, 88 NY2d at 184).

Only *Hecker* and *Black* advanced to steps two and three and we will now examine them separately.

## A. *People v Hecker*

■ Applying these standards to "all of the circumstances that bear upon the issue of racial animosity" (*Snyder*, 552 US at 478), we conclude that in *Hecker* there is no record support for Supreme Court's finding of pretext. In that regard, our review power is limited to the examination of Supreme Court's pretext determination in light of the reasons placed on the record by defense counsel concerning her removal of Chan. In doing so, we cannot engage in factfinding, but merely search the record for support for the trial court's ultimate pretext determination.

Here, defense counsel's reasons for striking Chan were essentially twofold. She informed Supreme Court that (1) she felt Chan appeared "austere in her demeanor and her temperament." In making that assessment, defense counsel acknowledged that (2) in the "short" 10 minutes allotted to her to voir dire all 18 of the panelists, she was unable to speak with everyone. As a result, defense counsel had to make "selective" choices in picking jurors and struck Chan because she did not know much about this panelist.

When Supreme Court made its finding of pretext, it focused exclusively on defense counsel's remarks concerning Chan's demeanor and temperament and concluded those assessments were not "conclusions which would flow from the answers given by [Chan]." In addition, Supreme Court held that there was "no differentiation . . . between this juror's responses and that of any of the other jurors which were found acceptable by counselor." We hold that these conclusions are an overly constricted view of the record as a whole that warrant no deference on review.

To begin, the People allege that defense counsel's choice not to ask Chan "a single question" is an indication of a specific racial bias against this juror. We disagree. There can be no doubt that the trial judge severely curtailed the parties from questioning the panelists, precluding them from conducting a more

meaningful voir dire. Supreme Court specifically informed the parties that they only had 10 minutes to voir dire the panelists in each round. In the second round of jury selection, defense counsel asked questions of only five of the seated 18 panelists. This fact, without more, cannot mean that defense counsel exhibited a bias against Chan or the other 12 unquestioned panelists. Rather, what it more realistically reveals is the impossibility of directing her attention to all of the panelists in the brief time she had to address them.[6]

Furthermore, there is no support in the record to conclude that defense counsel purposely avoided questioning panelists of Asian descent in order to justify peremptorily striking them at a later point. Rather, the record demonstrates that it was defense counsel who actually posed Lee a question in the second round of jury selection. When defense counsel began questioning him— the fifth and final panelist she was able to address that round— Supreme Court cautioned her that she had "one minute left." Moreover, defense counsel's voir dire in that round was further cut short by the lengthy colloquy that ensued between the judge and Lee. Significantly, when the court finished its questioning of this controversial panelist, it summarily informed defense counsel her time to voir dire had expired. While defense counsel did not initially approach the judge and ask for more time to question Chan or any of the other panelists, there is no record support that this omission was racially motivated.

Therefore, although inartfully worded, the crux of defense counsel's race-neutral explanation to strike Chan was that she knew little to nothing about her. Her decision to strike Chan thus cannot be construed to be rooted in "racial animosity" (*Snyder*, 552 US at 478) but rather a "rationale [with] some basis in accepted trial strategy" (*Miller-El*, 537 US at 339). Defense counsel's strategy, as the record bears out, was not to avoid or ignore a particular class of prospective jurors based on race but to remove jurors whom either she or both parties did not have time to address.

■ Next, the People contend that defense counsel's initial "reluctance" to offer a race-neutral reason for striking Chan supports Supreme Court's later finding of pretext. This argument likewise misconstrues the record. Rather, our examination

---

6. Our review of the record establishes that in the first round of jury selection, defense counsel questioned 12 of the 18 panelists. In the third round, out of the 26 seated panelists, defense counsel had the occasion to question only three of them.

of the record clearly demonstrates that defense counsel was of the genuine belief she was under no requirement to provide a reason for her peremptory strike (*see* CPL 270.25 [1]) because no pattern of discrimination had been established. A peremptory challenge is a challenge for which "no reason need be assigned" (*id.*). Defense counsel, who had originally challenged Lee for cause, vociferously explained her basis for striking Lee in a clear effort to refute the People's assertion that a pattern of discrimination against persons of Asian descent had been established. Indeed, defense counsel went to great lengths to demonstrate that Lee was a "questionable juror for a defense attorney." Although Supreme Court had denied defense counsel's earlier for cause challenge, she argued, in peremptorily striking Lee, that he wavered in accepting the basic constitutional principle that Hecker had no obligation to testify. She further suggested that the trial judge's intensive questioning did not rehabilitate him, but rather coerced Lee, "an aspiring law student"—through embarrassment by the court—into promising that he could set aside his desire to hear Hecker's version of the events and render a verdict in accordance with the evidence.

Thus, it makes sense that defense counsel would focus her remarks on Lee, whose controversial admissions occupied the majority of the questioning during that section of the voir dire, and not comment on Chan. Therefore, because defense counsel attempted to dispute that a pattern of discrimination had been established, her decision not to explain her basis for challenging Chan does not demonstrate a racial bias against this juror, but rather reflects her understanding of the statutory right to lodge peremptory challenges without having to provide a reason.

In our view, what is more telling than defense counsel's purported "reluctance" to place her reasons for striking Chan on the record is her proposal to reopen the voir dire following Supreme Court's finding of pretext. After Supreme Court made its ruling, defense counsel protested the validity of the finding, reemphasizing that no pattern of discrimination had been established in the first instance. She also renewed her argument that the limited time allotted to her to voir dire the panelists prevented her from speaking with most of them. Consequently, she asked to be given the opportunity to question Chan further, which the court denied. While we refrain from characterizing Supreme Court's denial of this request as an abuse of discretion as a matter of law, we note that the record would

have been more complete if Supreme Court agreed to defense counsel's proposal. More importantly, we find defense counsel's willingness to question Chan indicative of her genuine desire to learn more about this prospective juror and a reflection that her decision to strike her in the first instance was not on account of race. Nor can it be said from this record that defense counsel's reflections about Chan's austere demeanor and temperament indicate impermissible racial stereotyping.

In addition, Hecker maintains that the "flimsiness" of the step one prima facie showing of racial discrimination in this case is a factor that we ought to consider in determining whether we should accord deference to Supreme Court's step three pretextual ruling. While the sufficiency of the prima facie case showing becomes moot once a party states its race-neutral reasons for lodging a peremptory strike (see Smocum, 99 NY2d at 422), we agree with Hecker that the strength or paucity of the step one showing is a factor that should be considered in determining whether the record as a whole supports a finding of pretext (see Snyder, 552 US at 478 ["*all* of the circumstances that bear upon the issue of racial animosity *must be consulted*" (emphasis added)]). The language in Smocum, which states "[i]t makes no sense . . . to revisit the issue of whether a prima face case has been made once [a party] has come forward with race-neutral reasons" (99 NY2d at 422), merely stands for the proposition that, once race-neutral reasons have been advanced by a party, a trial court cannot return to the adequacy of the prima facie showing and end its inquiry there.

Turning to the prima facie showing in this case, we observe that in the second round of jury selection, defense counsel utilized two of her 15 peremptory challenges to strike two prospective jurors of Asian descent, one of whom she attempted to remove for cause. In response, the People made a reverse *Batson* application, simply noting for the record that the defense had eliminated the only two Asians questioned at that point. The People did not contend that the defense struck all persons of Asian descent from the venire. Indeed, such an argument could not have been advanced by the People. At least three other persons from the venire were likely of Asian descent— Choy, who spoke Chinese, Kazuko, who received her bachelors degree in Japan and coordinated tours for Japanese tourists in New York City, and Qu, who received his university degree in Beijing and who hosts "[c]ulture for Chinese language" television and radio programs.

Therefore, the People's prima facie case, which rested solely on the fact that defense counsel struck two jurors of Asian descent in one particular round, including Lee, who would have been a problematic juror for any defendant and who was unsuccessfully challenged for cause, was weak and is another factor that undermines Supreme Court's step three pretext finding.

In sum, although appellate courts accord great deference to trial judges' step three determinations, we conclude that Supreme Court's step three reverse *Batson* ruling was erroneous and that there is no record support for Supreme Court's rejection of defense counsel's race-neutral reasons for striking Chan. The People simply failed to meet their burden that racial discrimination was the motivating factor for defendant's challenges (*see Smocum*, 99 NY2d at 422; *Payne*, 88 NY2d at 183-184; *Allen*, 86 NY2d at 104).

Because Supreme Court erred in precluding defense counsel from exercising a peremptory strike against Chan, we must determine whether such error entitles this defendant to a new trial. The People argue Hecker is not entitled to a new trial because any error in seating Chan on the jury was harmless and did not deprive him of a fair trial. In support of this proposition, the People rely on the United States Supreme Court's recent pronouncement in *Rivera v Illinois* (556 US —, 129 S Ct 1446 [2009]). In that case, the issue on appeal was whether the erroneous denial of a defense peremptory challenge required automatic reversal of his conviction pursuant to the Due Process Clause of the Fourteenth Amendment (*see* 556 US at —, 129 S Ct at 1450). The Supreme Court answered this question in the negative. In doing so, the Supreme Court recognized that "there is no freestanding constitutional right to peremptory challenges" (556 US at —, 129 S Ct at 1453). Moreover, the Court held that "[b]ecause peremptory challenges are within the States' province to grant or withhold, the mistaken denial of a state-provided peremptory challenge does not, without more, violate the Federal Constitution" (556 US at —, 129 S Ct at 1454).

The United States Supreme Court, however, noted that "[a]bsent a federal constitutional violation, . . . States are free to decide, *as a matter of state law*, that a trial court's mistaken denial of a peremptory challenge is reversible error *per se*" (556 US at —, 129 S Ct at 1456 [first emphasis added]).

Thus, we look to our precedents and hold that such a mistake under New York law mandates automatic reversal.

Recently, in *Luciano*, we too recognized that "[t]hough not a trial tool of constitutional magnitude, peremptory challenges are a mainstay in a litigant's strategic arsenal," protected by the Criminal Procedure Law (10 NY3d at 502). "From 'earliest times the right of peremptory challenge was the privilege of the accused' " (*id.*, quoting *People v McQuade*, 110 NY 284, 293 [1888]).

In *People v Jones*, one of the three cases before us in *Payne*, we observed that in the context of a reverse *Batson* test, Supreme Court, at step two, commanded the defense to "articulate 'non-pretextual' reasons for the challenges" (88 NY2d at 186). Because Supreme Court's "merger of the step two and three requirements" impermissibly shifted the burden of persuasion on the issue of pretext from the People to the defense, we reversed the order of the Appellate Division and remitted the case to Supreme Court so that the trial court could satisfy the three-step *Batson* requirements (*id.*). We noted, however, that "if these requirements [were] not satisfied, the judgment of conviction should be vacated," in essence, because the defendant was deprived of his statutory right to exercise peremptory challenges (*id.*). Since, as the United States Supreme Court recently stated in *Rivera*, states are free to decide whether an erroneous denial of a peremptory challenge is reversible error per se, we perceive no basis to depart from our existing precedent (*see also People v Wilson*, 23 AD3d 682, 682 [2d Dept 2005] [judgment reversed where trial court erred in rejecting defendant's peremptory challenges]) and hold that the unjustified denial of a peremptory challenge violates CPL 270.25 (2) and requires reversal without regard to harmless error (*see Payne*, 88 NY2d at 186).

The dissent's criticism of our reliance on our cases which predate *Rivera* is unpersuasive (*see* dissenting op at 667-668). In *Rivera*, the United States Supreme Court specifically acknowledged the split in state authority at the time it rendered its decision (*compare Angus v State*, 695 NW2d 109, 118 [Minn 2005] [applying automatic reversal rule]; *State v Vreen*, 143 Wash 2d 923, 927-931, 26 P3d 236, 238-240 [2001] [same], *with People v Bell*, 473 Mich 275, 292-300, 702 NW2d 128, 138-141 [2005] [rejecting automatic reversal rule]). In affirming Illinois' decision to reject the automatic reversal rule when a peremptory challenge is erroneously denied, the Supreme Court made it clear that the states that opted to apply an automatic reversal rule—pre-*Rivera*—were permitted to do so.

Moreover, other states, following the United States Supreme Court's pronouncement in *Rivera*, have continued to apply an automatic reversal rule (*see e.g. Commonwealth v Hampton*, 457 Mass 152, 164, 928 NE2d 917, 927 [2010] [given the importance of peremptory challenges in state jurisprudence, "(w)e continue to adhere to the view that, for purposes of State law, the erroneous denial of a peremptory challenge requires automatic reversal"]).

We are also unmoved by the premonition cited by the dissent that an automatic reversal rule will "likely discourage trial courts and prosecutors from policing a criminal defendant's discriminatory use of peremptory challenges (556 US at —, 129 S Ct at 1455)" (*see* dissenting op at 668). At most, this is purely speculative. Rather, we believe that, no matter which party advances a *Batson* challenge, adherence to the three-step protocol—as in *Guardino*, *Hollis* and *Black*—will prevent a trial judge from "an error that would upset a conviction" (*see* dissenting op at 667-668).

## B. *People v Black*

In contrast to *Hecker*, we conclude that there is record support for Supreme Court's acceptance of the race-neutral reasons in *Black*. Preliminarily, we observe that Supreme Court adhered to both federal and state precedent in following the three-step *Batson* protocol. Once Supreme Court found a prima facie case, it asked the People, at step two, to state their reasons for challenging the jurors on the record. After the People completed this step, Supreme Court ruled that the articulated reasons were facially race neutral (*see Smocum*, 99 NY2d at 422) and proceeded to step three of the *Batson* inquiry. Then, Supreme Court asked defense counsel to explain why the People's proffered race-neutral reasons were pretextual.

At this step, Black did not meet his ultimate burden of persuasion. First, with respect to Thomas, the People's articulated basis for striking him related to his overall courtroom demeanor. Indeed, Supreme Court recognized that Thomas had a "body-language problem" when questioned by the People. We accord great deference on review to Supreme Court's observations of demeanor and credibility determinations (*see Miller-El*, 537 US at 339; *Smocum*, 99 NY2d at 422).

We also conclude that the reasons for striking Gordon and Williams—residence, employment status, and educational backgrounds—had "some basis in accepted trial strategy"

(*Miller-El*, 537 US at 339). Defendant asserts and the dissenting justice at the Appellate Division agreed, however, that since these reasons bore no relation to the actual facts of this particular case, they are "per se" pretextual. We reject this rule as overly restrictive and hold that trial courts must evaluate whether the proffered step two race-neutral reasons are pretextual based on the totality of all the relevant facts and circumstances (*see Payne*, 88 NY2d at 187 n 2; *see also People v Brown*, 283 AD2d 312, 312-313 [1st Dept 2001] [People not required to "show that the peremptory challenge was specifically related to the facts of the case"]).

Whether a proffered reason relates to the facts of a case or a prospective juror's qualifications is certainly a factor relevant to a court's determination of pretext, but, in our view, is not automatically dispositive. We observe that jury selection is, if not an art, an inexact science. In general, as a review of all these cases bears out, it is impossible to learn everything about a particular prospective juror during the screening process. Consequently, in deciding whether to challenge a prospective juror, the parties often rely on past experiences or "gut feelings" in making their selections. So long as race or gender is not a factor in the decision-making process, the parties are free to exercise their allotted peremptory challenges as they deem appropriate (*see e.g. People v Mancini*, 219 AD2d 456, 458 [1st Dept 1995] ["given the inexactness of the art of jury selection, an attorney is entitled to rely on personal experience with those employed in a particular capacity to screen potential jurors"]).

A party, for example, might not want a prospective juror who lives in a particular neighborhood or who works in a certain field to sit on the jury because that party believes—for reasons unrelated to the facts of the case—that such individual may have a more sympathetic attitude or view toward the opposing party (*see e.g. People v Wilson*, 43 AD3d 1409, 1411 [4th Dept 2007] [permissible for People to challenge social worker where prosecutor believed that social worker was predisposed to being more favorable to defendant]).

Likewise, a party's decision to strike a prospective juror who has little to no employment history or who has not sought higher education is not "per se" pretextual. In *People v Hinds* (270 AD2d 891 [4th Dept 2001, Pigott, Jr., P.J., on panel]), the defendant was charged with second-degree murder (*see id.* at 891). The People, in striking a prospective juror with "no significant employment history," stated that "he looked for jurors

with decision-making responsibilities and that this prospective juror had none" (*id.* at 891-892). In affirming the judgment of conviction, the Appellate Division noted that "[t]he record reflects that the prosecutor asked the other potential jurors about their employment histories and job responsibilities. Under those circumstances, we agree . . . that the prosecutor's explanation for the challenge was race-neutral and was not pretextual" (*id.* at 892). Though one's employment status has no relation to a second-degree murder prosecution, the People demonstrated a valid line of reasoning in exercising this particular peremptory challenge (*see Miller-El*, 537 US at 339).

In *Black*, our review of the record establishes that the People employed a general strategy to select primarily educated jurors with gainful employment or who have had at least a prior history of employment. Indeed, of the 12 seated jurors, nine were currently employed, one had retired after working for 53 years, one was currently in school earning her degree in nursing, and one was currently unemployed, but had worked as a home health aide for 22 years. Similarly, the record reveals that 10 of the 12 jurors had completed high school.[7] Thus, there is no basis to conclude that the three stricken jurors were treated disparately in relation to the jurors selected by the parties or that race played any part in their being peremptorily challenged.

On balance, there exists support in the record in *Black* for Supreme Court's acceptance of the People's race-neutral reasons and rejection of defense counsel's argument of pretext.

## VI.

In *Hecker*, in light of our decision to reverse and order a new trial, we need not address whether Supreme Court properly closed the courtroom to the public during the undercover officer's trial testimony.

In *Guardino*, we not only agree with the Appellate Division that Supreme Court properly ruled on the *Batson* challenge and that the evidence adduced at trial was legally sufficient to sustain a finding of guilt as to the enterprise corruption count, but also agree that Supreme Court properly instructed the jury during its deliberations and was justified in denying Guardino's mistrial motions.

---

7. In addition, the three alternates selected were all gainfully employed. Two of them had at least a college education.

In *Black*, we find no *Batson* error and the defendant's remaining contentions, raised in his pro se supplemental brief, are either unpreserved or without merit.

Accordingly, in *Hecker*, the order of the Appellate Division should be reversed and a new trial ordered, and in *Guardino*, *Hollis*, and *Black*, the respective orders of the Appellate Division should be affirmed.

SMITH, J. (concurring in *People v Guardino, People v Hollis* and *People v Black*, and dissenting in *People v Hecker*). I join the majority opinion in all these cases except *People v Hecker*, in which I dissent. Before discussing *Hecker*, however, I want to add a word about *People v Guardino*.

I

In *Guardino* defendant asserts, and the People do not dispute, that African-American women are a "cognizable group" for *Batson* purposes—i.e., that to use peremptory challenges against prospective jurors because they are African-American women would be a constitutional violation. The People do not challenge this assumption, and the majority opinion accordingly accepts it. I have no quarrel with accepting the premise for purposes of this case, but I want to point out that it is not obviously correct, though it may seem so.

One might at first think that, if it is unconstitutional for a prosecutor or defense lawyer to direct challenges at African-Americans as a group (which it is) or women as a group (which it is), it must also be impermissible to challenge African-American women as a group. But there is a counterargument. The lawyer who challenges African-American women—but is perfectly happy to have African-American men, and white women, on the jury—cannot be accused of either racism or sexism. That lawyer can certainly be accused of a cynical use of stereotypes—but a cynical use of stereotypes is a large part of what lawyers do when they make peremptory challenges (*see* Smith, *"Nice Work If You Can Get It": "Ethical" Jury Selection in Criminal Defense*, 67 Fordham L Rev 523 [1998]).

It is widely believed, whether true or not, that certain kinds of jurors—police officers and their families, members of "helping" professions, doctors, accountants, rich people, poor people, suburbanites, city-dwellers, the unemployed—bring predictable biases to jury service. As long as such beliefs are prevalent, lawyers exercising peremptory challenges will target the groups

they think least favorable to their cause. As to all the groups I have mentioned, this kind of stereotyping is perfectly legal. If the group is one defined by race or sex, it is not. Whether a group defined by race *and* sex is within *Batson*'s protections is an open question—one we do not decide today (*see United States v Walker*, 490 F3d 1282, 1291 n 10 [11th Cir 2007]).

## II

In *Hecker*, a defense lawyer challenged a prospective juror about whom the lawyer knew virtually nothing except that she was Asian. The lawyer found the prospective juror to be "extremely austere" and unlikely to be "flexible in her thinking." I do not understand how the majority can say, as a matter of law, that Supreme Court had no basis for finding the challenge to be racially motivated. It may not have been, of course; the lawyer may have deduced austerity and rigidity from the panel member's posture, or the expression on her face. Or, as the majority suggests, the lawyer could simply have been challenging the people she knew little about—but then why did she mention austerity and rigidity at all? The trial judge was surely in a better position than we are to guess at what the lawyer was thinking.

In *Batson* cases, a finding of pretext depends heavily on the trial judge's observations of demeanor and other intangible factors, which is why reviewing courts are supposed to accord great deference to a trial judge's findings on such issues (*Miller-El v Cockrell*, 537 US 322, 339 [2003]; *People v Hernandez*, 75 NY2d 350, 356 [1990]). The majority opinion states this rule, but does not follow it.

The majority also holds that New York law "mandates automatic reversal" whenever a defense peremptory challenge is mistakenly denied, even in good faith (majority op at 661). It does so despite the recent unanimous holding of the United States Supreme Court that no such rule is required by the Federal Constitution (*Rivera v Illinois*, 556 US —, 129 S Ct 1446 [2009]). The majority offers no reasoned justification for this holding, merely relying on pre-*Rivera* precedents.

I do not believe the majority's automatic-reversal rule is wise. It loads the dice against the People. A defendant, who need not fear an appeal by the People, can and generally will vigorously contest any prosecution use of a peremptory challenge that might raise *Batson* problems. But the People will be reluctant to do the same thing, lest they lead the trial judge into an error

that would upset a conviction. The rule of automatic reversal, as the Supreme Court said in *Rivera*, will "likely discourage trial courts and prosecutors from policing a criminal defendant's discriminatory use of peremptory challenges" (556 US at —, 129 S Ct at 1455). For this reason, even if I thought the trial judge in *Hecker* had erred, I would at least consider whether, on this record, his error warrants reversing Hecker's conviction.

GRAFFEO, J. (concurring in *People v Guardino*, *People v Hollis* and *People v Black*, and dissenting in *People v Hecker*). I agree that there should be an affirmance in *Guardino*, *Hollis* and *Black*, and therefore join the majority's analysis of those cases. I dissent in *Hecker*, however, for the reason as stated by Judge Smith that there is record support for the trial court's step-three finding of fact that the peremptory challenge was racially motivated. I do not join Judge Smith's discussion of *Guardino*.

Chief Judge LIPPMAN and Judges PIGOTT and JONES concur with Judge CIPARICK; Judge SMITH dissents in a separate opinion in which Judge READ concurs; Judge GRAFFEO dissents in another opinion.

In *People v Hecker*: Order reversed, etc.

Chief Judge LIPPMAN and Judges GRAFFEO, READ, SMITH, PIGOTT and JONES concur with Judge CIPARICK; Judge SMITH concurs in a separate opinion in which Judge PIGOTT concurs.

In *People v Guardino*: Order affirmed.

Chief Judge LIPPMAN and Judges GRAFFEO, READ, SMITH, PIGOTT and JONES concur.

In *People v Hollis* and *People v Black*: Order affirmed.